# Permissibility of the Administration and Use of the Federal Payroll Allocation System by Executive Branch Employees for Contributions to Political Action Committees

Federal employees who would offer the use of, or administer, the federal salary-allocation system for allotments to political action committees, would not, without more, violate 18 U.S.C. §§ 602 and 607, or the civil provisions of the Hatch Act Reform Amendments of 1993.

The Hatch Act Reform Amendments of 1993 would prohibit certain high-level and Executive Office employees identified in 5 U.S.C. § 7324(b), the duties and responsibilities of whose positions continue outside normal duty hours and while away from the normal duty post, from using the salary-allocation system to make contributions to political action committees.

The Hatch Act Reform Amendments of 1993 would not prohibit the remainder of federal employees covered by those Amendments from making contributions to political action committees through the salary-allocation system; however, 5 U.S.C. § 7324(a) would expressly prohibit such employees from taking steps to use the salary-allocation system to make such contributions while they are on duty or in a federal building.

While use of the salary-allocation system for contributions to political action committees would be lawful under certain circumstances, the head of each federal agency has the discretion to decide whether to make the system available for that purpose to employees of the agency.

February 22, 1995

MEMORANDUM OPINION FOR THE DIRECTOR
OFFICE OF PERSONNEL MANAGEMENT

Early last year, the Office of Personnel Management (''OPM'') advised executive branch officials that executive branch employees now are permitted to make voluntary salary allotments to political action committees (''PACs''), using the mechanisms otherwise available to federal employees for salary allotments to other organizations and institutions.[1] Under the salary-allotment system, a federal employee can authorize federal payroll administrators to transmit portions of his or her salary, on a regular basis, to certain persons or institutions designated by the assigning employee. *See* 5 C.F.R. pt. 550, subpart C.

The Criminal Division of the Department of Justice has questioned whether federal employees offering or administering the salary-allotment procedure for PAC contributions, or the employees who would make such contributions using that procedure, would thereby violate the Hatch Act Reform Amendments of 1993, Pub. L. No. 103–94, 107 Stat. 1001 (''HARA''), or two related criminal statutes,

---

[1] *See* Memorandum for Heads of Executive Departments and Agencies, from James B. King, Director, Office of Personnel Management (Feb. 17, 1994); Memorandum for [all] Executive Branch] Chiefs of Staff from Michael Cushing, Chief of Staff, Office of Personnel Management (Apr. 4, 1994).

47

18 U.S.C. §§ 602 and 607.[2] In response, OPM contends that such employees would not violate the HARA or those criminal statutes.[3]

We have reached the following conclusions with respect to the use of the salary-allocation system for contributions to PACs:[4]

1. None of the federal employees who would engage in the practices in question — offering the use of or administering the salary-allocation system, or making contributions to PACs through that system — would, without more, violate the relevant criminal provisions, 18 U.S.C. §§ 602 and 607.

2. Federal employees offering use of or administering the salary-allocation system for PAC contributions would not, without more, violate the civil provisions of the HARA. If, in practice, such employees were to request, urge or coerce other employees to make PAC contributions, they could thereby violate the HARA and the criminal statutes. But this potential for abuse does not render the proposed practice unlawful per se.

3. Certain high-level and Executive Office employees identified in 5 U.S.C. § 7324(b), the duties and responsibilities of whose positions continue outside normal duty hours and while away from the normal duty post, may not use the salary-allocation system to contribute money to PACs, because to do so would violate the HARA requirement that those employees not engage in political activity using "money derived from the Treasury of the United States." 5 U.S.C. § 7324(b)(1).

4. The remainder of federal employees covered by the HARA may not, while they are on duty or in a federal building, take steps to use the salary-allocation system to make contributions to PACs, because 5 U.S.C. § 7324(a) expressly prohibits those federal employees from engaging in political activity while on duty or while in a federal building. Thus, for example, a covered employee may not, while on duty or in a federal building, fill out direct-deposit forms for salary allocations to PACs and deliver such forms to the employees who would process or administer those allocations. A more difficult question is whether these contributing employees would violate the HARA if they were off duty and off federal premises when they take the steps necessary to trigger the use of the salary-alloca-

---

[2] *See* Memoranda for Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, from Jo Ann Harris, Assistant Attorney General, Criminal Division (Sept. 9, 1994; Oct. 24, 1994).

[3] *See* Letters for Dawn E. Johnsen, Deputy Assistant Attorney General, Office of Legal Counsel, from Lorraine Lewis, General Counsel, Office of Personnel Management (Oct. 27, 1994; Nov. 4, 1994; Nov. 10, 1994; Dec. 13, 1994).

[4] PACs, or "political action committees," are not defined as such under federal law However, 26 U.S.C. § 9002(9) defines "political committee" as:

> any committee, association, or organization (whether or not incorporated) which accepts contributions or makes expenditures for the purpose of influencing, or attempting to influence, the nomination or election of one or more individuals to Federal, State, or local elective public office.

*See also* 2 U.S.C. § 431(4) (similar definition with respect to committees making contributions and expenditures for federal elections). For purposes of this Opinion, "PAC" refers only to an organization that comes within this definition. In theory, there could exist other sorts of PACs that do not make contributions or expenditures for the purpose of influencing elections for partisan political office. In this Opinion, references to "PACs" do not include such committees, and insofar as federal employees might wish to use the salary-allocation system to make contributions to such committees, such a practice would be beyond the scope of the questions we address in this Opinion.

tion system — e.g., if an employee completes the direct-deposit form at home, and sends it from home to the appropriate administrative employees. Although the question is a close one, we conclude that such actions would not violate the HARA, because they are not proscribed by the literal terms of the prohibitions found in 5 U.S.C. § 7324(a).

While we have concluded that use of the salary-allocation system for PAC contributions would be lawful under certain circumstances, nevertheless the head of each federal agency has the discretion to decide whether to make the system available for that purpose to employees of the agency.[5]

## I. STATUTORY BACKGROUND

### A. *The Hatch Act Before the 1993 Amendments*

In 1939, Congress passed the original Hatch Act, which declared unlawful certain political activity of federal employees. *See* Act of Aug. 2, 1939, ch. 410, 53 Stat. 1147. In section 9(a) of the Hatch Act, 53 Stat. at 1148, Congress provided in pertinent part:

> No officer or employee in the executive branch of the Federal Government, or any agency or department thereof, shall take any active part in political management or in political campaigns. All such persons shall retain the right to vote as they may choose and to express their opinions on all political subjects.[6]

The prohibition in section 9(a) eventually was codified at 5 U.S.C. § 7324(a)(2) (Supp. III 1965–1967), which provided that "[a]n employee in an Executive agency . . . may not . . . take an active part in political management or in political campaigns."[7]

---

[5] *See* 5 U.S.C. § 5525 ("The head of each agency may establish procedures under which each employee of the agency is permitted to make allotments and assignments of amounts out of his pay for such purpose as the head of the agency considers appropriate."); 5 C.F.R. § 550.311(b) (an agency may permit an employee to make an allotment "for any legal purpose deemed appropriate by the head of the agency"). *Accord* Memorandum for Heads of Executive Departments and Agencies, from James B. King, Director, Office of Personnel Management at 1 (Feb. 17, 1994) (noting that, under OPM's proposal, the head of each executive agency would have the option of allowing that agency's employees to use salary allotments for distributing portions of their salaries to PACs).

[6] Section 9(a) further provided that heads and assistant heads of executive departments, and certain officers appointed by the President by and with the advice and consent of the Senate, were not "officers" or "employees" for purposes of that section.

[7] This prohibition did not apply to certain federal employees. *See* 5 U.S.C. §§ 7324(d)(1)–(3) (Supp. III 1965–1967). What is more, by a 1940 amendment to the Hatch Act, Congress exempted from the scope of section 9(a) any political activity in connection with nonpartisan campaigns, and activity in connection with any question not identified with a political party, such as constitutional amendments and referenda. Act of July 19, 1940, ch. 640, § 4, 54 Stat. 767, 772 (subsequently codified at 5 U.S.C. § 7326 (Supp. III 1965–1967)). Thus, under the old Hatch Act, "only *partisan* political activity [was] interdicted." *United Pub. Workers v. Mitchell*, 330 U.S. 75, 100 (1947) (emphasis added).

### B. *The Hatch Act Reform Amendments of 1993*

In 1993, Congress eliminated many of the restrictions that previously had cabined the political activities of federal employees. *See* Hatch Act Reform Amendments of 1993, Pub. L. No. 103–94, 107 Stat. 1001. Most importantly, Congress did an about-face on the prohibition at the very heart of the Hatch Act: under a new 5 U.S.C. §7323(a), effective February 3, 1994, covered federal employees "*may* take an active part in political management or in political campaigns," subject to specific exceptions. [8] Thus, the very category of activities that was prohibited under the old Hatch Act is now expressly permitted.

Congress did, however, specify several important exceptions to the general rule of §7323(a). *See* 5 U.S.C. §§7323(a)(1)–(4), 7323(b), 7324. For present purposes, three of those exceptions are germane:

1. Under 5 U.S.C. §7323(a)(2), a covered employee may not "knowingly solicit, accept, or receive a political contribution from any person," except under limited circumstances not material here (*see infra* note 11).

2. Under 5 U.S.C. §§7323(b)(2)–(4), employees of certain enumerated federal agencies, departments and entities — including, for example, the Criminal Division of the Department of Justice — will continue to be bound by the proscription of section 9(a) of the old Hatch Act (i.e., former 5 U.S.C. §7324(a)(2) (1988)): unlike most other federal employees, such "HARA-exempt" employees *cannot* "take an active part in political management or in political campaigns." [9]

3. Finally, almost all federal employees, including those who are "HARA-exempt," may not engage in "political activity" while: (i) on duty; (ii) in any room or building occupied in the discharge of official duties by an individual employed or holding office in the Government of the United States or any agency or instrumentality thereof; (iii) wearing a uniform or official insignia identifying the office or position of the employee; or (iv) using any vehicle owned or leased by the federal government or any agency or instrumentality thereof. 5 U.S.C. §7324(a). An exception to this prohibition is made for certain high-level and executive office employees identified in 5 U.S.C. §7324(b), the duties and respon-

---

[8] This provision in §7323(a) applies to any individual — other than the President, the Vice President, members of the uniformed services, and employees in particular agencies and departments specified in §7323(b) — who is employed or holding office in (i) an Executive agency other than the General Accounting Office; (ii) a position within the competitive service which is not an Executive agency; or (iii) the government of the District of Columbia (other than the Mayor, members of the City Council, and the Recorder of Deeds). *See* 5 U.S.C. §§7322(1), 7323(b). However, on September 20, 1994, this Office opined that Congress should not be understood to have intended that the President be precluded from limiting the political activities of employees who are political appointees; indeed, as we noted, if the HARA were instead interpreted to prevent a President from limiting the political activities of even his high-level political appointees, the statute would raise serious constitutional questions. Letter for Lorraine P. Lewis, General Counsel, Office of Personnel Management, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel (Sept. 20, 1994). *See also* 59 Fed. Reg. 48,765, 48,767, 48,771 (1994) (discussing proposed 5 C.F.R. §734.104, which reflects the Sept. 20, 1994 OLC letter).

[9] This prohibition does not apply to employees appointed by the President by and with the advice and consent of the Senate, even within the specified agencies, departments and entities. 5 U.S.C. §§7323(b)(2)(A), 7323(b)(3). *See also supra* note 8.

sibilities of whose positions continue "outside normal duty hours and while away from the normal duty post." *Id.* § 7324(b)(2)(A). These employees may engage in on-duty or on-premises political activity, but only "if the costs associated with that political activity are not paid for by money derived from the Treasury of the United States." *Id.* § 7324(b)(1).

It is the responsibility of the Office of Special Counsel ("OSC") to investigate allegations that federal employees have violated the prohibitions that remain in the HARA. If the OSC believes such a violation has occurred, it can present the case to the Merit Systems Protection Board ("MSPB"); the MSPB would then adjudicate the case. *See American Fed'n of Gov't Employees v. O'Connor*, 747 F.2d 748, 753 (D.C. Cir. 1984), *cert. denied*, 474 U.S. 909 (1985). If the MSPB finds that an employee has violated a prohibition in § 7323 or § 7324, the employee is subject to removal from his or her position. 5 U.S.C. § 7326. If the MSPB finds by unanimous vote that the violation does not warrant removal, a penalty of not less than a 30-day suspension without pay shall be imposed by direction of the MSPB. *Id.; see also Special Counsel v. Dukes*, 8 M.S.P.R. 549 (MSPB, 1981) (MSPB lacks discretion to impose a penalty less severe than a 30-day suspension without pay).

## C. *OPM's Regulations under the Hatch Act and under the HARA*

In 1984, OPM issued regulations that specifically interpreted the old Hatch Act to forbid use of the federal salary-allocation system for PAC contributions by federal employees. *See* 49 Fed. Reg. 17,431–32 (1984).[10] As we explain *infra* pp. 66–72, these regulations arguably were undermined by subsequent decisions of the federal courts and by other authorities. Nonetheless, between 1984 and the present date, the federal salary-allocation system has not been used to facilitate federal employees' PAC contributions.

On February 2, 1994, this Office concluded that, under the HARA, OPM continues to have certain responsibility for issuing regulations concerning permitted and prohibited activities under the Act. *See Authority for Issuing Hatch Act Regulations*, 18 Op. O.L.C. 1 (1994).

On February 4, 1994 (the day after the HARA took effect), OPM superseded its previous Hatch Act regulations, including the 1984 regulations that had proscribed the use of the salary-allocation system for PAC contributions. *See* 59 Fed. Reg. 5313–15. Thereafter, OPM advised executive branch officials that, in OPM's view, executive branch employees now are permitted to make voluntary salary allotments to PACs using the mechanisms otherwise available to federal

---

[10] Under the original Hatch Act, the Civil Service Commission ("CSC") was delegated limited authority to issue interpretive regulations defining the scope of permitted and prohibited activities. *See infra* pp. 63–66. In the Civil Service Reform Act of 1978, Pub. L. No. 95–454, 92 Stat. 1111, Congress eliminated the CSC, and OPM became "responsible for promulgating Hatch Act regulations." *American Fed'n of Gov't Employees*, 747 F.2d at 753. *See infra* p. 67.

employees for salary allotments to other organizations and institutions. *See supra* note 1.

On September 23, 1994, OPM published interim regulations, which would inform federal employees of the political activities that are permitted and prohibited under the HARA. 59 Fed. Reg. 48,765–77. Those interim regulations do not address directly the issue presented in this Opinion, though they do consider several subsidiary issues that are germane here, and that we will consider herein.

## D. *Related Criminal Statutes— 18 U.S.C. §§ 602, 607*

The Criminal Division also has questioned whether participants in the proposed practice would violate either of two criminal statutes, 18 U.S.C. §§ 602 and 607. Those statutes prohibit federal employees from soliciting political contributions from other federal employees (§ 602), and prohibit persons from soliciting or receiving political contributions while in a federal building (§ 607). *See infra* pp. 53, 58.

## II. APPLICATION OF THE HARA AND RELATED CRIMINAL STATUTES

Federal employees could be involved in the salary-allocation process in three distinct ways. First, under the procedure envisioned by OPM, certain federal employees — in particular, the heads of federal agencies — would *offer* other federal employees the opportunity to use the federal salary-allocation system to make contributions to PACs. Second, certain employees — possibly both within and outside the contributing employees' agency — would *administer* the salary allocations to PACs. Such employees would, for instance: collect the direct-deposit forms on which employees request an allocation to a PAC; perform the ministerial functions associated with such an allocation (such as recording the allocation, and sending the forms on to other federal employees involved in the processing); and transmit a portion of the contributor's salary to the PAC, or to a PAC bank account. Finally, certain federal employees would actually *make contributions to PACs* by way of the salary-allocation procedure. These employees would fill out direct-deposit forms indicating that they wish part of their salaries to be allocated and transmitted to various PACs, and would transmit those forms to the appropriate officials (such as the payroll officer in their agency or department) to begin processing. Subsequently, as a result of the contributing employees' allocations, other federal employees would transfer money to the designated PACs from the contributing employees' salaries.

In section A, *infra*, we discuss whether the federal employees who would offer other employees the opportunity to use the federal salary-allocation system for

PAC contributions would thereby violate the prohibitions on solicitation found in 5 U.S.C. § 7323(a)(2) and 18 U.S.C. §§ 602 and 607.

In section B, *infra*, we discuss whether the employees who would administer the transmission of PAC contributions would thereby violate the prohibition in 5 U.S.C. § 7323(a)(2) on accepting or receiving political contributions, or the prohibition in 18 U.S.C. § 607 on receiving political contributions in a federal building.

In section C, *infra*, we discuss whether administrative employees in "HARA-exempt" agencies and components who would handle and transmit other employees' PAC contributions would thereby violate the prohibition in 5 U.S.C. § 7323(b) on "tak[ing] an active part in political management or political campaigns."

Finally, in section D, *infra*, we discuss whether any of the participants in the proposed procedure would violate the "on-duty," "on-site," and related prohibitions found in 5 U.S.C. § 7324.

### A. *Solicitation — 5 U.S.C. § 7323(a)(2) and 18 U.S.C. §§ 602 and 607*

The Criminal Division has asked whether the act of offering employees use of the salary-allocation system to make PAC contributions would be "solicitation" of political contributions in violation of any or all of the following three statutes:

> * 5 U.S.C. § 7323(a)(2), which prohibits covered employees from soliciting "political contributions," except that one union member may solicit another union member to contribute to the union's PAC under certain circumscribed circumstances; [11]

> * 18 U.S.C. § 602(a), which makes it a felony for a federal officer or employee "to knowingly solicit any contribution within the meaning of section 301(8) of the Federal Election Campaign Act of 1971," from any other federal officer or employee; and

> * 18 U.S.C. § 607(a), which makes it a felony "for any person to solicit . . . any contribution within the meaning of section 301(8) of the Federal Election Campaign Act of 1971 in any room or building occupied in the discharge of official duties by [any officer or employee of the United States]."

---

[11] Specifically, an employee can solicit or receive political contributions if (i) the person being solicited or making the contribution is a member of the same federal labor organization or federal employee organization as the covered employee; (ii) the person being solicited or making the contribution is not a subordinate employee of the covered employee; and (iii) the solicitation is for a contribution to a multicandidate PAC of the labor organization or employee organization of the employees, and that PAC was established prior to October 6, 1993 5 U.S.C. § 7323(a)(2)(A)–(C).

We conclude that federal employees, including the heads of agencies, would not violate the prohibition on "solicitation" in any of these three statutes merely by offering employees use of the salary-allocation system to make voluntary PAC contributions.

All three statutes ultimately are derived from the prohibitions on solicitation in sections 11 and 12 of the Civil Service Act of 1883, ch. 27, 22 Stat. 403 ("the Pendleton Act"); [12] and we see no reason why "solicit" should not have the same meaning in all three statutes. [13] However, Congress has not provided a definition of the term "solicit" in any of the three provisions. Therefore, we must give that term its ordinary meaning. *See, e.g., Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995).

In two recent opinion letters, the Office of Special Counsel — which has the authority under 5 U.S.C. § 1212(f) to issue advisory opinions on the Hatch Act [14] — offered this definition of "solicit": "to try to obtain by entreaty, persuasion or formal application." [15] Under this definition, asking, requesting, or urging another federal employee to make a political contribution would be prohibited (putting aside the exception described in 5 U.S.C. § 7323(a)(2), which is not relevant here). *See also People v. Murray*, 307 Ill. 349, 365, 138 N.E. 649, 655 (Ill. 1923) (to solicit a contribution is "to try to obtain by asking; to ask for the purpose of receiving").

We think the Special Counsel's definition of "solicit" is an appropriate one. [16] Under the Special Counsel's definition — indeed, under any ordinary under-

---

[12] Section 602(a), for example, is derived from section 11 of the Pendleton Act, which provided in pertinent part that no congressional, judicial or executive branch officer or employee "shall, directly or indirectly, solicit or receive, or be in any manner concerned in soliciting or receiving, any assessment, subscription, or contribution for any political purpose whatever, from any officer, clerk, or employee of the United States, . . . or from any person receiving any salary or compensation from moneys derived from the Treasury of the United States." 22 Stat. at 406. In 1980, section 11 of the Pendleton Act was amended to eliminate the provision prohibiting *receipt* of contributions by federal employees. Pub. L. No. 96–187, tit. II, §201(a)(3), 93 Stat. 1339, 1367. *See* H.R. Rep. No. 96–422, at 25 (1979), *reprinted in* 1979 U.S.C.C.A.N. 2860, 2885.

Similarly, the prohibition currently found in §607 is a descendent of section 12 of the Pendleton Act, which provided in pertinent part that "no person shall, in any room or building occupied in the discharge of official duties by any officer or employee of the United States . . ., solicit in any manner whatever, or receive any contribution of money or any other thing of value for any political purpose whatever." 22 Stat. at 407.

[13] In enacting the HARA, Congress added §602(b), which states that an activity cannot be a violation of §602(a) "unless that activity is prohibited by section 7323 or 7324" of the HARA. *See* Pub. L. No. 103–94, §4(b), 107 Stat. at 1005. Thus, a person's conduct cannot violate §602(a) unless it is also a civil violation of the HARA. Congress did not impose a similar restriction on §607. Thus, in theory, "solicit" could have a meaning in §607 distinct from its meaning in the other two statutes. But we see no reason not to treat the term identically in all three statutes.

[14] *See American Fed'n of Gov't Employees*, 747 F.2d at 752–55 (explaining the nature and effect of "the advice the Special Counsel is permitted to give").

[15] *See* Letter for Cheryl D. Mills, Associate Counsel to the President, from William E. Reukauf, Associate Special Counsel for Prosecution, Office of Special Counsel at 2 (Feb. 4, 1994); Letter for Dennis I. Foreman, Deputy General Counsel, Department of the Treasury, from William E. Reukauf, Associate Special Counsel for Prosecution, Office of Special Counsel at 2 (Feb. 4, 1994).

[16] This definition is, for example, consistent with pertinent dictionary definitions of "solicit." As we have explained, the solicitation prohibitions derive from the Pendleton Act. Shortly after enactment of that Act, Black's Law Dictionary defined "solicitation" as "Asking; enticing; urgent request." *Black's Law Dictionary* 1105 (1st ed. 1891); *see also Black's Law Dictionary* 1392 (6th ed. 1990) ("Asking; enticing; urgent request. . . . Any action which the relation of the parties justifies in construing into a serious request."); *Webster's Third New Int'l Dictionary*

standing of the term — it is hard to see how the conduct in question here would rise to the level of "solicitation." Pursuant to OPM's proposal, the head of each agency would send a memorandum to all employees informing them that "there is now no legal ban to voluntary allotments by Federal employees directed to political action committees." *See* Memorandum for [all Executive Branch] Chiefs of Staff, from Michael Cushing, Chief of Staff, Office of Personnel Management (Apr. 4, 1994), Attachment 2. The proposed memorandum further would "emphasize" to employees that "this program is entirely voluntary on your part, a service we have added for our employees." *Id.* Such a memorandum would not urge employees to make contributions, and would not request or encourage such action. We conclude that such an offer of use of the salary-allocation system for voluntary PAC contributions would not thereby be a "solicitation" of such contributions. *Cf., e.g., In re Dodds*, 2 Political Action Reporter 253 (Civil Service Comm'n, 1945) (announcing to employees under one's supervision that they had the legal right to make voluntary contributions to political campaign funds if they so desired is not, without more, "solicitation").

Moreover, the statutory context of the solicitation ban in § 7323 supports this conclusion. In § 7323(a), Congress has prohibited only those solicitations that can be said to constitute "tak[ing] an active part in political management or in political campaigns." [17] The "tak[ing] an active part" standard was derived from the prohibition in section 9(a) of the old Hatch Act. *See supra* p. 49. Under the old Act, two courts of appeals held that a covered federal employee could violate the "tak[ing] an active part in political management or in political campaigns"

2169 (1986) (defining "solicit" as, inter alia, "to make petition to: entreat, importune . . .; *esp*: to approach with a request or plea (as in selling or begging)"; "to move to action: serve as an urge or incentive to. incite"; "to strongly urge (as one's cause or point): insist upon"; "to endeavor to obtain by asking or pleading: plead for . . .; *also*: to seek eagerly or actively"; "to demand as a requisite: call for: require"). Also notable is 47 U.S.C. § 227(a)(3), which defines "telephone solicitation" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." This definition would require some encouragement or urging, at the very least.

OPM, in its interim regulations, has proposed that "solicit" should mean "to *request expressly* of another person that he or she contribute something to a candidate, a campaign, a political party, or partisan political group." 59 Fed. Reg. 48,771 (1994) (proposed 5 C.F.R. § 734.101) (emphasis added). We believe OPM is correct that a "request" (or an "urging") is required, but we have no occasion to decide whether such a request necessarily must be "express[]" A strong argument could be made that even an "implicit," or veiled, request is a solicitation. For example, the Special Counsel has concluded that it would be a solicitation for an official to "suggest" that an individual work for a political campaign. *See* Letter for Dennis I. Foreman, Deputy General Counsel, Department of the Treasury, from William E. Reukauf, Associate Special Counsel for Prosecution, Office of Special Counsel at 3 (Feb. 4, 1994); *see also People v. Murray*, 307 Ill. at 365, 138 N.E. at 655 ("Solicitation [of political contributions] is not necessarily by word of mouth or writing."); *Civil-Service Law — Political Contributions — Solicitation of by Federal Officer*, 24 Op. Att'y Gen. 133, 134–35 (1902) (dissemination to federal employees of a circular stating that financial assistance is "needed" for Republican state committee, and that supervisory officials "will be greatly obliged" if the recipients "will aid to the extent of [their] ability and inclination," even though not a "demand," was a "request" constituting an impermissible solicitation under section 11 of the Pendleton Act); *Special Counsel v. Rivera*, 61 M.S.P.R. 440, 443–44 (MSPB, 1994) (letter stating that "[w]e hope you can . . . contribute to this worthy cause [viz., a partisan candidacy]" was a solicitation of contributions).

[17] That section *permits* employees to "take an active part in political management or in political campaigns." The prohibition of solicitation is enumerated as one of the few exceptions to this rule; thus, it is fair to read the statute as prohibiting only those solicitations that in fact constitute "tak[ing] an active part in political management or in political campaigns."

prohibition only if that employee acted *"in concert with* a partisan political campaign or organization." *Biller v. MSPB,* 863 F.2d 1079, 1090 (2d Cir. 1988) (emphasis added); *accord Blaylock v. MSPB,* 851 F.2d 1348, 1356 (11th Cir. 1988) ("the Hatch Act is violated only by actions taken in concerted effort with partisan activity or formal, organized, political groups"). Were an employee, such as the head of an agency, merely to inform other employees of their legal rights, and in a neutral manner make available to them a means of exercising those rights, that employee would not thereby be acting "in concert with a partisan political campaign or organization." Therefore, such an offering employee would not have taken an "active part in political management or in political campaigns," and, accordingly, would not have engaged in improper solicitation under §7323(a). [18]

Notwithstanding the foregoing, the Criminal Division has suggested that the act of offering access to the salary-allocation system for PAC contributions may violate the law because, in practice, such an offer may be *perceived* as soliciting such contributions. The Criminal Division's argument is that, as a result of the paperwork associated with the salary-allocation system, an employee's "giving history" can be "accessed and examined by management." Moreover, the Federal Election Campaign Act ("FECA") requires that political committees, such as the PACs in question here, publicly identify all persons who have contributed more than $200 in a calendar year. 2 U.S.C. § 434(b)(3)(A); *see also id.* § 438(a)(4) (names of such contributors available for public inspection). The fact that management can thereby discover an employee's political contributions "provides fertile ground for the proposed payroll withholding program to assume a most sinister cast." Memorandum for Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, from Jo Ann Harris, Assistant Attorney General, Criminal Division at 6–7 (Oct. 24, 1994). According to the Criminal Division,

> once employees realize that their political giving patterns can be individually accessed and traced through payroll records or through FECA reports, offers of payroll withholding made by management are susceptible of being understood by employees as suggestions that an affirmative response is expected. Once that occurs, it seems to us that the offer of payroll withholding for PAC donations becomes a "solicitation" on the part of those in management that circulate it.

---

[18] The case would be very different, of course, if the offer were not neutral, such as where contributions were permitted only to certain PACs deemed acceptable to the agency head. In that case, *the Biller/Blaylock* standard might be met, and the action might fairly be considered "taking an active part in political management or in political campaigns"; such differential treatment in favor of some PACs to the exclusion of others might, therefore, amount to an improper "solicitation," depending on the circumstances. But that is not the scenario OPM proposes.

*Id.* at 7. This argument is similar to that used by OPM itself in 1984 to justify its prohibition on salary allotments to PACs. [19]

This argument has two principal problems. First, the hypothesized danger — that management may be able to discover employees' contribution practices — is not unique to the making of PAC contributions through the salary-allotment procedure. The public has access, by virtue of the FECA, to significant information about contributors to PACs, and this will be the case whether or not those contributions are made through the salary-allocation system. The risk of access to contribution information should not be significantly greater as a result of use of the salary-allocation system: federal officials should not have any additional access to contribution practices of their subordinates through payroll records. Records of employees' financial contributions retained in personnel files within the employees' agency are protected by the Privacy Act, *see* 5 U.S.C. § 552a(a)(4)–(5), and may not be revealed to the officers and employees of the agency, *id.* § 552a(b). [20]

Second, and more important, it is not legally dispositive that some subordinate employees might *perceive* that they are expected to contribute to PACs. The mere possibility that an offer of access to a salary-allocation system may be susceptible of being misunderstood by some employees as a solicitation does not automatically transform all offers into solicitations. Section 7323(a) of the HARA and 18 U.S.C. §§ 602 and 607 do not prohibit a "sinister cast"; they prohibit conduct that is, in fact, solicitation.

What is more, even if the proposed practice might be susceptible to a risk of actual (rather than merely perceived) solicitation, that risk does not render the practice unlawful per se. Whether any particular "offer" of access to the salary-allocation system for PAC contributions would be an impermissible solicitation

---

[19] OPM explained that such a prohibition was required for prophylactic reasons:

> Use of the Federal payroll system as a vehicle for collecting political contributions, as well as the convenience of making these contributions through payroll deductions, would increase the opportunities for coercion of employees. Introducing the political contribution process into Government would make it possible for supervisors, administrative officers, and others in a position to affect careers or working conditions to discover the identity of political contributors and other information concerning their contributions. Because allotments or payroll deduction authorizations pass through many hands during processing, there exists the risk of either intentional or inadvertent disclosure of sensitive data. Although such a disclosure could be cause for discipline, tracing the disclosure to its source in the processing chain would not be possible in every case. The authority to discipline thus would not be a complete deterrent and where exercised would not forestall potential misuse of the information already disclosed. Even if the integrity of payroll data is not compromised, individual employees could be directly approached by colleagues or superiors seeking to identify contributors. *Even if not so intended, this could create among employees a perception of pressure to contribute to a particular political action fund.*

49 Fed. Reg. at 17,432 (emphasis added).

[20] There is an exception to this prohibition where those officers or employees "have a need for the record in the performance of their duties." *Id.* § 552a(b)(1). It is difficult, however, to imagine a situation in which supervisors would have a legitimate "need . . . in the regular performance of their duties" for information concerning their subordinates' political contributions. *See Parks v. IRS,* 618 F.2d 677, 680–81 (10th Cir. 1980).

would depend on the particular facts of each case. [21] In those cases where ostensible offers do cross the line to become actual solicitations, the makers of such solicitations will be subject to penalty under 5 U.S.C. §§ 7323(a)(2) and 7324(a), and may be subject to criminal sanctions under 18 U.S.C. §§ 602 and 607, as well. In addition, if a supervisor does tell (or suggest to) subordinate employees that their contribution practices will be "accessed and examined by management," or if a supervisor (or other employee) otherwise pressures an employee to contribute to PACs, such action could constitute impermissible "coercion" under 18 U.S.C. § 610. [22] But the fact that there may be such instances of abuse does not mean that every offer of access to the system automatically becomes a solicitation.

## B. *Receipt—5 U.S.C. § 7323(a)(2) and 18 U.S.C. § 607*

The Criminal Division has questioned whether the federal employees who would implement and administer other employees' salary allocations to PACs would violate 5 U.S.C. § 7323(a)(2) or 18 U.S.C. § 607, which prohibit some forms of "receiving" or "accepting" political contributions:

> \* Under § 7323(a)(2), a covered federal employee may not "accept, or receive a political contribution from any person," except that one union member may receive another union member's contribution to the union's PAC, as long as the contributing employee is not a subordinate of the receiving employee.

> \* Under § 607, it is a felony "for any person to . . . receive any contribution within the meaning of section 301(8) of the Federal Election Campaign Act of 1971 in any room or building occupied in the discharge of official duties by [any officer or employee of the United States]."

Under the proposed practice, some administrative employees would process the direct-deposit forms, and would transmit to PACs a portion of contributing employees' salaries. Even if it could be argued that these administering employees would (in some sense) handle the money from the contributing employees' salaries prior to transmitting the contributions to the PACs, we conclude that this cannot

---

[21] *See The President—Interpretation of 18 U.S.C. § 603 [now § 607] as Applicable to Activities in the White House*, 3 Op. O.L.C. 31, 32 n.3 (1979) ("We have not considered a . . . critical question, which turns primarily on matters of fact, i.e., whether a solicitation within the terms of the statute has occurred.").

[22] Section 610, which was enacted as part of section 4 of the HARA, 107 Stat. at 1005, provides:

It shall be unlawful for any person to intimidate, threaten, command, or coerce, or attempt to intimidate, threaten, command, or coerce, any employee of the Federal Government as defined in [HARA] section 7322(1) . . . to engage in, or not to engage in, any political activity, including, but not limited to, voting or refusing to vote, for any candidate or measure in any election, making or refusing to make any political contribution, or working or refusing to work on behalf of any candidate. Any person who violates this section shall be fined not more than $5,000 or imprisoned not more than three years, or both.

be considered "receipt" or "acceptance" of the contributions in the sense intended under the two pertinent statutes.

The Attorney General addressed this issue in the early years of the Pendleton Act. Section 11 of the Pendleton Act, which was the direct predecessor of the statutes at issue here, provided in pertinent part that no congressional, judicial or executive branch officer or employee "shall, directly or indirectly, . . . receive, or be in any manner concerned in . . . receiving, any assessment, subscription, or contribution for any political purpose whatever, from any officer, clerk, or employee of the United States, . . . or from any person receiving any salary or compensation from moneys derived from the Treasury of the United States." 22 Stat. at 406.

In 1896, Attorney General Harmon opined that section 11 should not be strictly construed to make criminal the "purely mechanical" handling of a political contribution by a federal employee. *Contributions for Political Purposes*, 21 Op. Att'y Gen. 298 (1896). In the case the Attorney General considered, one Bellman, an agent of the Postmaster General, was detailed to be the conduit for payments by the government to secret agents. Under the "established practice," secret agents sent orders to Bellman to make payments out of their government remittance directly to the agents' families, creditors, etc. *Id.* at 299. One agent asked Bellman to pay $50 to another person, in aid of a political campaign. Bellman — who had nothing whatever to do with soliciting or inducing such a diversion of funds — did as the agent asked him. Despite the fact that Bellman knew the diversion of funds was in aid of a political campaign, *id.,* and the fact that Congress in section 11 "absolutely prohibited the . . . receipt of political contributions by all persons in the Government service in any place or in any way," *id.* at 300, the Attorney General concluded that "I can not see how it can fairly be said that [Bellman's action] was a violation of the provisions of [section 11]." *Id.* The Attorney General reasoned:

> It is admitted that [Bellman] did not solicit the contribution. Nor can it be said, in any proper sense of the term, that he received it. He physically took the money from the package, but he did so merely as the agent of the owner, and so long as it remained in his possession he held it as the agent of the owner, who had a right at any time to revoke his order and reclaim the money. This right continued until Bellman actually handed the money over to the third person, who alone can be said to have received it. When he received it it was from the secret agent in Chicago by the hand of Bellman and not from Bellman. He was accountable to the agent in Chicago and not to Bellman for its use or misuse. Bellman had no more to do with the transaction than a mere messenger would have had to whom the owner had handed it for delivery. The receipt

> of money, etc., intended by [section 11] is acceptance of possession
> which confers a right of disposal, not possession which simply con-
> stitutes the taker a mere custodian without right on his own behalf
> or that of others.

*Id.* at 300–01. [23]

We agree with Attorney General Harmon's reasoning, and think it directly applicable here. [24] "The receipt of money . . . intended by [§ 7323(a)(2) and by § 607] is acceptance of possession which confers a right of disposal, not possession which simply constitutes the taker a mere custodian without right on his own behalf or that of others." Indeed, the ministerial employees under the proposed practice would not even have the option to decline to handle the contributions in question: as a part of their assigned duties, they would be required to treat allocations to PACs as they do all other allocations. We therefore conclude that, because the administering employees — like postal employees who pick up and deliver mail containing PAC contributions — would be "mere custodians," or conduits, of the contributions, they would not be recipients thereof.

Moreover, the employees administering the allocated contributions to PACs would not be acting *"in concert with* a partisan political campaign or organization." *Biller,* 863 F.2d at 1090 (emphasis added). Therefore, like the employees who "offer" the use of the allocation system, *see supra* pp. 55–56, they would not be "tak[ing] an active part in political management or in political campaigns," and, accordingly, could not be in violation of § 7323(a)(2). [25]

---

[23] *See also In re Harper, reported in* Thirty-fifth Annual Report of the Civil Service Commission 178 (1919) (the Justice Department, citing the "pettiness of the offense," refused to prosecute a federal employee who had acted as a conduit, or "temporary custodian," of political contributions).

[24] The Civil Service Commission subsequently disagreed with the Attorney General's interpretation of section 11; the CSC reasoned instead that "even if [a federal employee] acts as the agent or messenger of another officer or employee for the purpose of delivering a contribution, voluntary or otherwise, to a political committee, the receipt by the agent of money from his principal, knowing it to be for the purpose mentioned, and both being officers or employees of the United States, is prohibited by the statute." *In re LeRoy, reported in* Thirtieth Annual Report of the Civil Service Commission 149, 151 (1914). And, in the *LeRoy* case and in another case occurring at approximately the same time, certain United States Attorneys and two district judges apparently agreed with the CSC's interpretation, rather than with that of Attorney General Harmon. *See id.* at 152 (reporting successful prosecution of LeRoy); *In re Dutro, reported in* Thirtieth Annual Report of the Civil Service Commission 158 (1914) (quoting judge's ruling rejecting 1896 Attorney General Opinion, and reporting eventual conviction for violation of section 11). The CSC subsequently cited the *Dutro* case as having "definitively establishe[d] the principle that an employee of the Government who receives a political contribution from another such employee as a mere agent or messenger for the purpose of turning it over to a political organization commits a violation of [section 11]." CSC Form 1236, "Political Activity and Political Assessments of Federal Officeholders and Employees," § 39, at 20 (1939). We are, however, more persuaded by the 1896 Attorney General Opinion.

[25] Under the proposed definitions of "accept" and "receive" in the interim OPM regulations, the ministerial handling of contributions could not constitute "acceptance" or "receipt" of those contributions, because the employees in question would not be acting "officially on behalf of" the PACs to which the contributions were made. *See* 59 Fed. Reg. at 48,770–71 (proposed 5 C.F.R. § 734.101). This interpretation is consistent with the holdings in *Biller* and *Blaylock. See id.* at 48,768–69 (discussing *Biller* and *Blaylock*).

## C. *Handling of Contributions by Employees in "HARA-Exempt" Agencies and Components — 5 U.S.C. § 7323(b)*

Under 5 U.S.C. §§ 7323(b)(2)–(4), employees of certain enumerated federal agencies, departments and components — including, for example, the Criminal Division of the Department of Justice — cannot "take an active part in political management or political campaigns." *See supra* p. 50. The statutory definition of this "take an active part" standard is, moreover, the same under the HARA as it was under the pre-HARA Hatch Act. [26] Congress's intent was that the employees in question would be "exempt from coverage under the [HARA] and maintained under the current [*i.e.*, pre-HARA] law." 139 Cong. Rec. 15,789 (1993) (statement of Sen. Roth). [27]

Under the old Hatch Act, OPM had interpreted the "take an active part" standard to prohibit federal employees from handling or accounting for other federal employees' PAC contributions, [28] and OPM had, in fact, specifically determined that the persons administering the federal salary-allocation system would violate the law if the system were used for PAC contributions. [29] *See supra* p. 51; *infra* pp. 68–70. The Criminal Division has argued that "HARA-exempt" employees should still be subject to these regulatory prohibitions:

> [I]t appears to us that under 5 U.S.C. § 7323(b)(4), employees of
> . . . excluded components remain bound by the prohibitions con-
> cerning political activity by federal employees that were in effect
> prior to 1940 which contain prohibitions on "handling" or
> "accounting for" political funds, as well as the "solicitation,"
> "acceptance," or "receipt" of political contributions. 5 C.F.R.
> § 733.122(b)(3). The terms "handling" and "accounting for" seem
> to us broader than the terms "solicit," "accept," or "receive" that
> apply to employees in the remainder of the government. If we are
> correct in that conclusion, and if we are correct in assuming that
> employees of the Criminal Division continue to be governed by
> the broader terms of 5 C.F.R. § 733.122(b)(3), one might reasonably
> argue the mere administrative processing of payroll withholding
> forms concerning PAC donations by the Division support staff
> places them at risk of inadvertently violating the Act.

---

[26] *Compare* 5 U.S.C. § 7324(a)(2) (1988) *with* the current 5 U.S.C. § 7323(b)(4).

[27] *See also, e.g.,* 139 Cong. Rec. at 15,743 (statement of Sen. Roth) (exempt employees "should continue to be Hatched"), *id.* at 15,789 (statement of Sen. Roth) (certain employees would be "exempted from the relaxation of the Hatch rule"); *id.* at 16,043 (statement of Sen. Roth) (employees of the DOJ Criminal Division would be "exempt from the changes in the Hatch Act"); *id.* at 21,810 (statement of Rep. Myers) (exempt employees "will . . . continue to be covered under the [old] Hatch Act"); *id.* at 21,811 (statement of Rep. Byrne) (exempt employees are "exclude[d] . . . from the reforms").

[28] *See* 5 C.F.R. § 733.122(b)(3) (1994), *superseded,* 59 Fed. Reg. 5313–15 (1994).

[29] *See* 49 Fed. Reg. 17,431, 17,431–33 (1984) (establishing new regulations at 5 C.F.R. §§ 733.101(g)–(h), 733.122(b)(14)–(16)).

Memorandum for Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, from Jo Ann Harris, Assistant Attorney General, Criminal Division at 8 (Oct. 24, 1994).

We conclude, however, that the HARA-exempt employees do not necessarily "remain bound by the prohibitions" contained in the pre-HARA OPM regulations. In the sections that follow, we demonstrate: first, that OPM's pre-HARA regulations may not have interpreted the Hatch Act accurately; and second, that, in any event, OPM has the authority to amend those pre-HARA regulations in the manner reflected in its new regulations. In order to demonstrate why this is so, it is necessary to describe in some detail the historical treatment of the "take an active part" legal standard.

1. *Before the Hatch Act: 1883–1939*

The Civil Service Act of 1883, ch. 27, 22 Stat. 403, better known as the Pendleton Act, declared that "no person in the public service is for that reason under any obligations to contribute to any political fund, or to render any political service," 22 Stat. at 404 and that "no person in said service has any right to use his official authority or influence to coerce the political action of any person or body," *id.* The Act authorized the President to promulgate rules to carry out the provisions of the Act, and created the Civil Service Commission ("CSC") to administer the Act under the rules promulgated by the President. 22 Stat. at 403–05.

In 1907, in accordance with an executive order issued by President Roosevelt, Civil Service Rule I was amended to read, in pertinent part:

> Persons who, by the provisions of these rules are in the competitive classified service, while retaining the right to vote as they please and to express privately their opinions on all political subjects, *shall take no active part in political management or in political campaigns.*

Twenty-fourth Annual Report of the Civil Service Commission 104 (1908) (emphasis added).

The CSC thereafter exercised its authority to investigate and adjudicate alleged violations of this Rule. The scope and meaning of the "take no active part" clause were defined "in the mode of the common law" through these CSC adjudications. *Civil Service Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 559 (1973). Between 1907 and 1939, the CSC applied Rule I in over 3000 adjudicated cases. The CSC from time to time summarized its adjudicatory rulings in the form of guidelines. Most important for present purposes, section 17 of CSC Form 1236, published in 1939, stated: "An employee may make political contributions to any committee, organization, or person not employed by the United States, *but may not solicit, collect, receive, or otherwise handle or disburse the contribu-*

*tions.''* CSC Form 1236, ''Political Activity and Political Assessments of Federal Officeholders and Employees,'' § 17, at 7 (1939) [hereinafter ''1939 CSC Form 1236''], *quoted in* Appendix to *Letter Carriers*, 413 U.S. at 584 (emphasis added).

2. *The Hatch Act—1939–1940*

In section 9(a) of the Hatch Act, 53 Stat. at 1148, Congress by statute extended to the entire federal service the prohibition reflected in Rule I. Section 9(a) provided in pertinent part:

> · No officer or employee in the executive branch of the Federal Government, or any agency or department thereof, *shall take any active part in political management or in political campaigns.* All such persons shall retain the right to vote as they may choose and to express their opinions on all political subjects.

In its next session, Congress attempted to give some substantive content to section 9(a)'s prohibition on taking an ''active part in political management or in political campaigns.'' The Senate Committee, led by Senator Hatch, first proposed that a new section 15 of the Hatch Act authorize and direct the CSC to promulgate rules or regulations defining the term ''active part in political management or in political campaigns.'' *See Letter Carriers*, 413 U.S. at 570 n.16 (quoting proposed section 15 in S. Rep. No. 76–1236, at 4 (1940)). But this proposed conferral of ''broad rulemaking authority'' to the CSC was greeted on the Senate floor with ''strong objections,'' as being ''an unwise and invalid·delegation of legislative power to the Commission.'' *Id.* at 570. *See, e.g.*, 86 Cong. Rec. 2352 (1940) (statement of Sen. McKellar); *id.* at 2426–27 (statement of Sen. Lucas); *id.* at 2875 (statement of Sen. Thomas); *id.* at 2924–27 (statement of Sen. Thomas); *see also* Henry Rose, *A Critical Look at the Hatch Act* (''Rose, Critical Look''), 75 Harv. L. Rev. 510, 513 (1962) (opposition in Senate to such a broad delegation of rulemaking authority to CSC ''was strong and persistent'').

In response to this opposition to the delegation of broad rulemaking authority to the CSC, Senator Hatch offered a substitute section 15, which limited the reach of the prohibition in section 9(a) to ''the same activities . . . as the United States Civil Service Commission has heretofore determined are at the time of the passage of this act [*viz.*, July 19, 1940] prohibited on the part of employees in the classified civil service of the United States by the provisions of [Civil Service Rule I].'' *See* 86 Cong. Rec. 2928, 2937 (1940). Congress passed this substitute amendment. *Id.* at 2958–59. *See* Act of July 19, 1940, ch. 640, 54 Stat. 767, 771: As later codified in 5 U.S.C. § 7324(a)(2) (Supp. III 1965–1967), the phrase ''an active part in political management or in political campaigns'' was defined to mean:

> those acts of political management or political campaigning which were prohibited on the part of employees in the competitive service

before July 19, 1940, by determinations of the Civil Service Commission under the rules prescribed by the President.

Thus, under the Hatch Act, the pre-1940 "determinations" of the CSC defined what behavior was unlawful. The decisions in these CSC cases, however, were not reported, nor were they (or are they) even available to the public; rather, the decisions were "buried in the raw file in a dusty storage cabinet" at the CSC. Rose, *Critical Look*, 75 Harv. L. Rev. at 516. [30] Therefore, it was (and is) difficult to ascertain how, under Rule I, the CSC treated actions by federal employees involving the handling of political contributions. [31] In addition, those adjudicatory rulings were widely perceived to be "inconsistent, or incapable of yielding any meaningful rules to govern present or future conduct." Letter Carriers, 413 U.S. at 571.

Federal employee unions eventually challenged the definition in section 15 as being impermissibly vague. In rejecting that challenge, the Supreme Court held that Congress had not codified into law the inaccessible, "impenetrable jungle of Commission proceedings, orders, and rulings," *id.*; rather, the Court held, Congress intended section 15 to transform into codified law the CSC's "administrative restatement of Civil Service Rule I law" — namely, the 1939 version of CSC Form 1236 — modified as necessary to reflect provisions in the 1939 and 1940 Acts themselves. *Id.* at 572–74.

The Court's holding in Letter Carriers meant that the prohibitions summarized in the 1939 CSC Form 1236 — included as an appendix to the Court's opinion in Letter Carriers, 413 U.S. at 581–95 — defined the scope of the prohibition contained in section 9(a) of the Hatch Act. *Id.* at 572–75. [32] As of 1939, the CSC rule as to political contributions was as follows: "An employee may make political contributions to any committee, organization, or person not employed by the United States, but may not solicit, collect, receive, or otherwise handle or disburse the contributions. (*See* provisions of the Criminal Code, discussed in secs. 36 to

---

[30] *See also id.* at 522; Marick F. Masters & Leonard Bierman, *The Hatch Act and the Political Activities of Federal Employee Unions: A Need for Policy Reform*, 45 Pub. Admin. Rev. 518, 520 (1985) (quoting CSC's acknowledgement that the public cannot go to original sources to study CSC's pre-Hatch-Act determinations, because those determinations are "'embodied in diffused files and records of the commission'").

[31] Some of the CSC's decisions were summarized in annual reports. One can glean from these reports, that the CSC, at least in certain instances, concluded that the ministerial handling of political contributions by federal employees violated Rule I, even where those employees had no political objectives of their own and were acting solely as agents of the contributors. For instance, in one case, the CSC requested the removal from federal service of an employee who had acted as a mere conduit for another's contributions. *In re LeRoy*, reported in Thirtieth Annual Report of the Civil Service Commission 149, 152 (1914) (reporting events that occurred in 1910–1913). On the other hand, in a case occurring at virtually the same time as *LeRoy*, the CSC considered similar behavior merely a "technical[] violat[ion of] the law," and found it sufficient simply to issue a warning to the employee not to engage in similar conduct in the future. *In re Wagner, reported in* Twenty-ninth Annual Report of the Civil Service Commission 164, 164 (1913) (reporting events that occurred in 1910–1911).

[32] *Accord Political Activity by Government Employees*, 40 Op. Att'y Gen. 14, 26 (1941). *But see* Rose, *Critical Look*, 75 Harv. L. Rev. at 513–14, 518 n.33 (arguing, contrary to the conclusion in *Letter Carriers*, that the congressional purpose was in fact to codify the more than 3000 individual pre-1940 CSC determinations, rather than the Form 1236 pamphlet restatement).

50.).'' 1939 CSC Form 1236 at 7, *quoted in Letter Carriers*, 413 U.S. at 584.[33] In 1940, in light of the Hatch Act itself, the CSC changed the rule to the following:

> *Employees may not solicit, collect, receive, disburse, or otherwise handle contributions made for political purposes.* They may make voluntary contributions to a regularly constituted political organization for its general expenditures.

CSC Form 1236a, ''Political Activity and Political Assessments of Persons Employed by State and Local Agencies in Connection with Activities Financed in Whole or in Part by Loans or Grants Made by the United States or by any Federal Agency,'' § 14, at 8 (1940) (emphasis added).

However, this rule, like the others the CSC promulgated in 1939–1940, did not set in stone the scope of prohibited activities under the Hatch Act. In *Letter Carriers*, the Court recognized that the CSC's definition of prohibited activities had changed over time in accordance with the CSC's reformulation of Form 1236 and, after 1970, in accordance with the regulations that the CSC promulgated in lieu of Form 1236. 413 U.S. at 575 (citing 5 C.F.R. pt. 733). The post-1970 CSC regulations were, the Court held, the ''wholly legitimate descendants of the 1940 restatement adopted by Congress and were arrived at by a process that Congress necessarily anticipated would occur down through the years.'' *Id.* Thus, the Court held that the contours of the ''take an active part'' prohibition in section 9(a) of the Hatch Act properly had *evolved* in accordance with the CSC's revised rules and regulations.

Significantly, however, the Court held that Congress had established two substantial limitations on the CSC's authority to promulgate regulations defining prohibited activities. First, those regulations were *not* to be promulgated pursuant to a ''broad rulemaking authority'' on the part of the CSC; indeed, Congress expressly had rejected such a broad delegation of rulemaking power. *Id.* at 570–71. Thus, the CSC's regulations were merely interpretive, rather than legislative, or substantive.[34] Second, Congress placed a specific limit on the CSC's power to alter Form 1236 (and subsequently, to alter its regulations): the CSC's further development of the law of prohibited activities had to be ''within the bounds of, *and necessarily no more severe than*, the 1940 rules.'' *Letter Carriers*, 413 U.S. at 575 (emphasis added). That is to say, the 1940 rules (i.e., the 1939 CSC Form 1236 as amended by the provisions of the 1939 and 1940 Acts themselves) provided the ''outer limits'' of any subsequent redefinition of prohibited activities.

---

[33] Sections 36 to 50 of Form 1236, referenced in section 17, discussed several criminal statutes, including, most important, sections 11 and 12 of the Pendleton Act, at that time codified at 18 U.S.C. §§ 208, 209. *See* 1939 CSC Form 1236 at 17–22.

[34] *See, e.g., Batterton v. Francis*, 432 U.S. 416, 425 n.9 (1977) (discussing differences between interpretive and legislative regulations), *Health Ins. Ass'n v. Shalala*, 23 F.3d 412, 422–24 (D.C. Cir. 1994), *cert. denied*, 513 U S. 1147 (1995); *Alcaraz v. Block*, 746 F.2d 593, 613–14 (9th Cir. 1984); *American Postal Workers Union v. United States Postal Serv.*, 707 F.2d 548, 558–60 (D.C. Cir. 1983), *cert. denied*, 465 U.S. 1100 (1984).

*Id.* at 576; *see also id.* at 571–72 (CSC could not fashion a more expansive defini-
tion of prohibited activities); *id.* at 574 (CSC was to proceed to perform its role
under the Hatch Act "within the limits" of the 1940 rules).

In sum, by interpreting the Hatch Act, the CSC could over time loosen, or
eliminate, prohibitions found in its 1939–1940 rules, but it could not establish
more restrictive prohibitions than those identified in the 1940 version of CSC
Form 1236a.

3. *CSC Interpretations—1942–1978*

Despite the broad ban expressed in the 1939–1940 CSC rule on the solicitation,
collection, receipt, disbursement and handling of contributions made for political
purposes, the CSC did not apply this rule in a literal fashion in adjudications
after 1940. Most important, the CSC held in various adjudications that "handling"
political contributions did not, without more, necessarily constitute taking "an
active part in political management or in political campaigns."

For instance, the Commission acknowledged that a postman (a federal
employee) carrying mail "handles" campaign contributions without violating the
statute. *In re Burns, et al.*, 1 Political Activities Reporter ("P.A.R.") 538, 540
(1952). By the same token, an employee who did a "trivial favor" for a friend
by delivering membership cards to a political club did not thereby violate the
statute. *In re Hendershot*, 1 P.A.R. 166, 173 (1946).

In a series of cases, the Commission ruled that employees did not violate the
Act by delivering fellow employees' remittance for tickets for a political organiza-
tion's dinner, or by delivering the organization's dinner tickets to fellow
employees, so long as the employees performing the ministerial task were not
involved in promoting the dinner. *In re Burns, et al. (McDonald, Green, Higgins,
Chandler and Kearns)*, 1 P.A.R. 538, 542–43 (1952); *In re Hargadine*, 1 P.A.R.
629, 633 (1952); *In re Edwards*, 1 P.A.R. 714 (1954); *In re Villone*, 1 P.A.R.
719 (1954). In such cases, the charged employees were "merely endeavoring to
accommodate friends," by "acceding" to their "requests." *Hargadine*, 1 P.A.R.
at 633. The Commission accordingly refused to find a violation on the basis of
such a "minimal errand service." *Villone*, 1 P.A.R. at 719.

Finally, in a case of particular relevance here, the Commission found that a
federal employee did not violate the Act when, "[a]s a favor" to three supervisory
employees, "he mailed their contributions to the campaign committee of their
choice." *In re Branlund*, 1 P.A.R. 752, 753 (1955). Although undoubtedly this
was a "handling" of political contributions in a literal sense, *id.*, the Commission
nevertheless ruled that the employee "took no active part in political management
or in a political campaign," *id.*

Despite these adjudicatory decisions, the CSC continued to publish more strin-
gent rules. And in 1970, the CSC retained the strict prohibitions when it issued
regulations on this subject. 35 Fed. Reg. 16,785 (1970). Thus, although under
the regulations a federal employee had the right to "[m]ake a financial contribu-

tion to a political party or organization," 5 C.F.R.§733.111(a)(8) (1971), an employee still was prohibited from "[d]irectly or indirectly soliciting, receiving, collecting, *handling, disbursing, or accounting for* assessments, contributions, or other funds for a partisan political purpose," *id.* §733.122(b)(3). Because §733.122(b)(3) did not define a prohibition more stringent than those identified in the 1939 and 1940 CSC rules, this regulation was within the CSC's delegated authority, according to the Court's subsequent decision in *Letter Carriers*. By the same token, the CSC's adjudicatory decisions limiting the severity of this prohibition, *see supra* p. 66, also were within the Commission's power, because they reflected a diminution, rather than an enhancement, of the activities defined in 1939 and 1940 as constituting an "active part in political management or in a political campaign."

### 4. Dissolution of the CSC and Creation of OPM—1978

Under the Civil Service Reform Act of 1978, Pub. L. No. 95–454, 92 Stat. 1111, Congress eliminated the CSC, and OPM took over CSC's responsibility for promulgating Hatch Act regulations. *See American Fed'n of Gov't Employees v. O'Connor*, 747 F.2d 748, 753 & n.13 (D.C. Cir. 1984), *cert. denied*, 474 U.S. 909 (1985).[35] This authority, however, did not mean that Congress gave OPM either unlimited or dispositive power to interpret the Hatch Act. For one thing, OPM's regulatory authority was to be no more extensive than that previously given to the CSC — that is, OPM did not inherit any "broad rulemaking authority," *see Letter Carriers*, 413 U.S. at 570–71; therefore, OPM's Hatch Act regulations are merely interpretive (rather than "legislative").[36] Moreover, those regulations may not identify activities as prohibited unless such activities were within the group of prohibited activities defined in the CSC's 1939 and 1940 rules. *See supra* pp. 64–66.[37]

---

[35] *See also Authority for Issuing Hatch Act Regulations*, 18 Op. O.L.C. 1, 3 & n.6 (1994).

[36] *See supra* p. 65 & note 34. By contrast, in another section of the Hatch Act, Congress had granted the CSC express "legislative" rulemaking authority with respect to another matter, namely, identifying geographical areas where federal employees could take a more active role in political campaigns and management. *See* Act of July 19, 1940, ch. 640, §16, 54 Stat. 767, 771, Pub. L. No. 89–554, 80 Stat. 378, 526 (1966). Accordingly, the CSC's rules issued pursuant to this grant of authority were legislative in nature, rather than interpretive. *See Joseph v. CSC*, 554 F.2d 1140, 1153 & nn.24–25 (D.C. Cir. 1977). This rulemaking authority was passed on to OPM in 1979, *see* 5 U.S.C. §7327 (Supp. III 1979); and OPM retains this rulemaking authority with respect to the geographic exceptions under the HARA, *see* 5 U.S.C. §7325. Accordingly, regulations issued pursuant to that authority, *see, e.g.*, 59 Fed. Reg. 5313, 5314 (1994) (proposed 5 C.F.R. §733.102), presumably are legislative, rather than interpretive.

[37] In some ways, OPM's regulatory authority is more limited than that previously enjoyed by the CSC. The MSPB has been assigned the task of reviewing the "rules and regulations of the Office of Personnel Management," 5 U.S.C. § 1204(a)(4); *see also id.* § 1204(f). Thus, the MSPB has oversight authority "in the review of Hatch Act regulations promulgated by the OPM." *American Fed'n of Gov't Employees*, 747 F.2d at 755. Furthermore, the Supreme Court has explained that Hatch Act regulations themselves (now issued by OPM) should continue to be "refined by further adjudications," "within the outer limits of the 1940 rules." *Letter Carriers*, 413 U.S. at 576. This refinement role once was committed to the same agency that issued the regulations — the CSC. However, the MSPB — not OPM — has "inherited the CSC's 'accustomed role' of refining the law of prohibited political activities through the continual decision of cases." *American Fed'n of Gov't Employees*, 747 F.2d at 755.

### 5. *OPM's Amended Regulations on Salary Allocations to PACs—1982–1984*

Before 1982, no agency or court had considered or addressed the applicability of the Hatch Act to PAC contributions. On December 28, 1982, OPM published proposed regulations "to clarify the . . . existing regulatory prohibition [in 5 C.F.R. § 733.122(3)] on the solicitation, payment, collection, and receipt of political contributions." 47 Fed. Reg. 57,724, 57,724. In order to make clear that the federal payroll-deduction system could not be used for political contributions, including contributions to PACs, OPM proposed to expand the Hatch Act definition of "contribution,"[38] and to add three new subsections to the list of "prohibitions."[39] OPM reasoned that automatic salary allocations to PACs should be impermissible because "the use of a Federal payroll deduction scheme or the Government's allotment system as a conduit for political contributions by Federal employees subject to the Hatch Act would involve the use of Federal workplaces and instrumentalities to pay, collect, and receive such contributions." *Id.* OPM also alleged that such a practice would "raise[ ] the unacceptable possibility of abuse," and would "enable or encourage supervisors and co-workers to bring varieties of impermissible pressures upon the employee to [contribute]." *Id.; see also supra* note 19.

Public-employee unions raised numerous objections to the proposed regulations. Moreover, the Office of Special Counsel informed OPM that, in the opinion of the Special Counsel, the Hatch Act would not be violated by employees who perform the administrative and clerical "handling" of other employees' PAC contributions:

> The employees who perform the administrative and clerical chores which effect another employee's contribution to AFGE-PAC arguably violate the Hatch Act since their duties cause them to "indirectly . . . handle . . . contributions . . . for a partisan political purpose." (*See* section 733.122(b)(3), Part 733.5 C.F.R.). However, this indirect, per[ip]heral "handling" of political contributions

---

[38] The proposed definition of contribution was "any gift, subscription, loan, advance, deposit of money, allotment of money, or anything of value given or transferred by one person to another, including in cash, by check, by draft, through a payroll deduction or allotment plan, by pledge or promise, whether or not enforceable, or otherwise." 47 Fed. Reg. at 57,725 (proposed 5 C.F.R. § 733.101(h)) (emphasis added).

[39] Under OPM's proposed regulation, the following three prohibitions would have been added to the list in 5 C.F.R. § 733.122:

> (14) Soliciting, collecting, or receiving a contribution from any employee for any political party, *political fund,* or other partisan recipient;

> (15) Paying a contribution to any employee who is the employer or employing authority of the person making the contribution for any political party, *political fund,* or other partisan recipient; and

> (16) Soliciting, paying, collecting, or receiving a contribution, at or in any Federal workplace, for any political party, *political fund,* or other partisan recipient.

47 Fed. Reg. at 57,725. "Political fund," in turn, was defined to include any PAC that, inter alia, expends or transfers money or anything of value to any candidate or organization, "for purposes of influencing in any way the outcome of any partisan election." *Id.* (proposed 5 C.F.R. § 733.101(g)).

can be distinguished from that which is performed by someone as an incident to holding office in a political party or PAC. The employees who process the paperwork which accomplish the contribution to AFGE-PAC are performing their official duties. The individual who "handles contributions" for the Democratic or Republican party has identified himself with the success of a partisan political party. The Hatch Act was intended to restrict federal employees with respect to the latter not the former.

Memorandum for William E. Reukauf, Deputy Associate Special Counsel for Prosecution, Office of the Special Counsel, from John R. Erck, Attorney, *Re: Closure Recommendation AFGE—PAC-DC, OSC Matter No. 10–3–00469* (Dec. 2, 1983) (concurred in by Deputy Associate Special Counsel Reukauf on Dec. 6, 1983; transmitted to OPM on Apr. 6, 1984).

Despite the unions' objections and the Special Counsel's opinion, OPM issued its amended regulations in final form on April 24, 1984. 49 Fed. Reg. at 17,431–32. In the comment stage, the American Federation of Government Employees ("AFGE") had contended that OPM lacked the authority to issue the new regulations; AFGE argued that OPM would be acting outside its statutory authority by creating a new prohibition, beyond those enumerated in the 1940 CSC Rules.[40] In the final regulations, OPM responded to this argument by stating that "these regulations do not exceed the boundaries set forth in the Hatch Act. They merely clarify an existing OPM regulation (5 CFR 733.122(b)(3))." 47 Fed. Reg. at 17,431.

OPM's defense of its authority was well-founded. OPM's new 1984 regulations technically did not create any prohibition broader than that already contained in the sweeping proscription found in the 1939 and 1940 CSC rules regarding the handling of contributions, *see supra* pp. 64–66; rather, OPM simply issued clarifying regulations to explain how that already-existing prohibition (5 C.F.R. § 733.122(b)(3)) applied to a new fact situation — namely, salary allocations to PACs.

It is important to note, however, that whereas OPM was empowered to issue the 1984 regulations, it was not required to do so; indeed, OPM could instead have modified its previous rules to permit the practice in question, which would have been in accord with the opinion of the Special Counsel (*see supra* pp. 68–69) and with the adjudicatory decisions of the CSC (*see supra* pp. 66–67).[41] What

---

[40] *See Comments of American Federation of Government Employees on Proposed Rule of Office [of] Personnel Management Amending 5 CFR Part 733, Political Activity of Federal Employees* at 20 n.13 (submitted to OPM March 4, 1983).

[41] In publishing its regulations, OPM stated that "[t]he overwhelming majority of the former Civil Service Commission's decisions . . . have held that these activities are violations of the Hatch Act." 49 Fed. Reg. at 17,431. OPM did not, however, cite any CSC "decisions" in support of this proposition, and, as explained *supra* p. 66, this claim is belied by the historical evidence: in contrast to the strict CSC rules, the CSC adjudications almost uniformly

Continued

is more, exercising its power to reinterpret the Hatch Act to loosen its prohibitions, *see supra* pp. 65–67, OPM could have eliminated altogether the broad prohibition found in §733.122(b)(3) of the regulations against "handling, disbursing, or accounting for" political contributions.

6. *The Biller and Blaylock Cases — 1988*

As we previously have noted, *supra* pp. 55–56, in two cases in 1988, federal courts of appeals ruled that the test of whether a federal employee had taken "an active part in political management or in political campaigns" was whether that employee had acted *"in concert with* a partisan political campaign or organization." *Biller*, 863 F.2d at 1090 (emphasis added); *accord Blaylock*, 851 F.2d at 1356 ("the Hatch Act is violated only by actions taken in concerted effort with partisan activity or formal, organized, political groups").

The legal status of federal-employee salary allocation to PACs thus was in a state of flux following *Biller* and *Blaylock*. On the one hand, the OPM regulations plainly prohibited any federal employee from "directly or indirectly soliciting, receiving, collecting, handling, disbursing, or accounting for assessments, contributions, or other funds for a partisan political purpose," 5 C.F.R. §733.122(b)(3) (1994); and the 1984 amendments to the regulations made clear that this prohibition extended to salary-allotment systems, *id.* §733.101(h), and included contributions to a PAC so long as that PAC "expends" or "transfers" money to, *inter alia,* any political party, candidate, or organization, *id.* §733.101(g). On the other hand, *Biller* and *Blaylock* could fairly be read to indicate that federal employees who performed the ministerial acts of handling, processing, and transferring fellow employees' PAC contributions would not violate the Hatch Act, because those ministerial actions would not be undertaken "in concert with" any partisan political campaign or organization, including the PAC itself.

7. *The Hatch Act Amendments — 1993–94*

In the HARA, Congress retained the old Hatch Act definition of "tak[ing] an active part in political management or in a political campaign": i.e., "those acts of political management or political campaigning which were prohibited for employees of the competitive service before July 19, 1940, by determinations of the Civil Service Commission under the rules prescribed by the President." 5 U.S.C. §7323(b)(4). There is, moreover, no reason to believe that Congress intended the content or scope of this definition to be anything other than what the Supreme Court described in *Letter Carriers. See supra* pp. 63–66.

OPM continues to have the same regulatory authority that it enjoyed under the pre-1993 Hatch Act to define the contours of "tak[ing] an active part in political management or in a political campaign." *See supra* pp. 66–67. Pursuant to that

---

had held that mere ministerial handling of political contributions by federal employees did not constitute taking an "active part in political management or in a political campaign."

authority, OPM superseded its old Hatch Act regulations on February 4, 1994. 59 Fed. Reg. 5313–15. Thereafter, on September 23, 1994, OPM published interim regulations. In those regulations, OPM has eliminated from the list of prohibited activities — including from the list of activities prohibited for "HARA-exempt" employees — the four subsections (formerly 5 C.F.R. §§ 733.122(b)(3), (14)–(16)) that were the basis for OPM's conclusion in 1984 that salary allocations to PACs were prohibited, *see supra* pp. 68–70. Thus, there currently is nothing in OPM's regulations prohibiting "handling," or "accounting for," political contributions.

8. *Summary*

This historical survey demonstrates why, for two reasons, HARA-exempt employees are not bound by law to the terms of OPM's pre-HARA regulations.

First, it is far from clear that it would have been impermissible to "handle" or "account for" other employees' PAC contributions prior to the HARA. While it is true that, by their plain terms, the OPM regulations previously found at 5 C.F.R. §§ 733.122(b)(3), (14)–(16) prohibited the actions at issue, it also is true that those regulations were contradicted by: (i) the adjudicatory decisions of the CSC in the years immediately following passage of the Hatch Act, *see supra* pp. 66–67; (ii) the opinion of the Special Counsel in 1983, *see supra* pp. 68–69; and, most importantly, (iii) the decisions of the Second and Eleventh Circuits in *Biller and Blaylock*, respectively, *see supra* p. 70. These other authorities held that the ministerial "handling" of political contributions was not proscribed by the Hatch Act if the employee doing the handling was not acting on behalf of the political group or candidate to which the contribution was made.

Second, even if the pre-1994 OPM regulations had constituted binding and applicable law prior to the HARA, the HARA did not codify into law the terms of those prior regulations with respect to HARA-exempt employees. Rather, the HARA simply left intact the Hatch Act definition of "active part in political management or in political campaigns." As we have explained, *supra* pp. 65–70, this definition was not static: OPM (previously the CSC) was empowered to alter the definition in the direction of more permissive regulation. OPM continues to have that authority under the HARA.

In the proposed regulations, OPM has exercised its delegated authority to redefine what constitutes an "active part in political management or in political campaigns." Whereas "handling" and "accounting for" such contributions once were proscribed by the OPM regulations, they no longer are. OPM's redefinition, moreover, comports with the great weight of authority over the years respecting the ministerial handling of political contributions, including the adjudicatory decisions of the CSC after the Hatch Act and the decisions of the courts of appeals in *Biller* and in *Blaylock*. Therefore, the OPM regulations now are in accord with the other authorities on the matter, and there no longer is any bar on the ministerial handling of, or "accounting for," political contributions, including contributions to PACs.

## D. *Political Activity On Duty and in a Federal Building—5 U.S.C. §7324*

The Criminal Division has asked whether any of the participants in the proposed practice would violate the prohibitions stated in 5 U.S.C. §7324. Almost all covered employees, whether or not they are HARA-exempt, may not engage in "political activity": (i) while on duty; (ii) while in "any room or building occupied in the discharge of official duties by an individual employed or holding office in the Government of the United States or any agency or instrumentality thereof"; (iii) while wearing a uniform or official insignia identifying the employee's office or position; or (iv) while using any vehicle owned or leased by the federal government. 5 U.S.C. §7324(a)(1)–(4). An exception to these prohibitions is made for certain employees whose duties and responsibilities continue "outside normal duty hours and while away from the normal duty post." *Id.* §7324(b)(2)(A). These employees may engage in on-duty or on-premises political activity, but only "if the costs associated with that political activity are not paid for by money derived from the Treasury of the United States." *Id.* §7324(b)(1).

Congress did not define "political activity" in the HARA. OPM has proposed that "political activity" be defined as "an activity directed toward the success or failure of a political party, candidate for partisan political office, or partisan political group." 59 Fed. Reg. at 48,770–71 (proposed 5 C.F.R. §734.101). We think that this definition, as far as it goes, comports with Congress's intent. But it is important to note one other salient fact: It is evident from the statements of the HARA's leading sponsors that Congress intended to create a bright-line rule, with no exceptions: section 7324(a) prohibits covered employees from engaging in all on-duty and on-site political activity.[42] As the principal Senate

---

[42] *See, e.g.,* 139 Cong. Rec. 15,365–68 (1993) (statement of Sen. Glenn) ("no political activity of any kind on the job"; "nothing political on the job, not even a lapel button of any size"; political activity on the job "would be absolutely and unequivocally prohibited . . . ; no political activity on the job, zero, including even what is permitted under today's Hatch Act"; "Nothing on the job. Cannot even wear a campaign button on the job."; "all political activity on the job would be banned"; "Absolutely no political activity will be acceptable on the job"); *id.* at 15,376 (statement of Sen. Glenn) ("unequivocally, . . .—no political activity on the job"); *id.* at 15,531–32 (statement of Sen. Glenn) ("Simply put . . . what S. 185 does is say that you do not even permit anything on the job that has been permitted all these years under the Hatch Act. You cut it out. There will be no politics on the job, none."; "On the job, you can do nothing, period.", "no button [of] any kind, on the job, no kind of political activity on the job period"; "No political activity on the job—zero—including even what is permitted today."); *id.* at 15,739–41 (statement of Sen. Glenn) ("[T]here will be no political activity on the job. There are no exceptions to that. There will be no political activity of any kind on the job."; "This bill would say on the job, you can do absolutely nothing political. You cannot have a campaign button on. You cannot do anything."); *id.* at 16,038 (statement of Sen. Glenn) ("We prohibit all political activity on the job with S. 185. I keep hammering . . . and hammering that thought home, because there has been so much misunderstanding. We tighten up the Hatch Act and make it tougher than it now is. No political contributions, no political activity, no wearing of a button on the job."; "[o]n the job, zero"); *id.* at 16,054 (statement of Sen. DeConcini) ("The prohibition on workplace activity is an absolute prohibition.").

In an earlier session of Congress, Senator Glenn—the chief sponsor of Hatch Act reform legislation—expressed the same understanding with respect to an identical provision, noting that the on-the-job prohibition "has to be Simon pure—you cannot do anything." 136 Cong. Rec. 9156 (1990); *see also id.* at 9358–59 (statement of Sen. Glenn) ("None. A one-word answer, no political activity on the job.", "nothing of a political nature is permitted on the job; I mean nothing"; "This would clarify it. This would say anything on the job is verboten, it is out, it is not permitted. . . . If you are on duty and you are on the job, that is it, no politics."); *id.* at 10,034 (statement of Sen. Glenn) ("there can be no political indication, there can be no political activity on the job; none, period;

sponsor of the bill stated, on-the-job political activity "would be absolutely and unequivocally prohibited." 139 Cong. Rec. 15,366 (statement of Sen. Glenn). [43] Thus, for example, Congress intended to prohibit the wearing of political buttons on duty. [44] Nor can covered employees stuff envelopes with political materials or send out campaign materials while they are on the job or in a federal building — such activities are permitted only off-site and "off the job." [45] Most important for present purposes, political contributions, including PAC contributions, cannot be "request[ed]" nor "given" while on the job: "[i]t would be

no solicitation, no public statement, no nothing on the job of a political nature"); *id.* at 15,098 (statement of Sen. Glenn) ("Nothing can be done of a political nature while you are on the job during the day. Nothing. Zero. That is it."; "All political activity on the job is banned. Everything.").

Earlier in that same session, several sponsors of equivalent legislation in the House also spoke of the on-duty ban in absolutist terms. *See, e.g.,* 135 Cong. Rec. 6767 (1989) (statement of Rep. Horton) ("No on-the-job political activity will be allowed. Just that simple, none whatsoever."); *id.* at 6773 (statement of Rep. Martin) ("prohibits any political activity whatsoever on the job"); *id.* (statement of Rep. Morella) ("It will ban absolutely all politicking in the Federal workplace . . . . By taking this black and white approach, no partisan political activities on the job, any otherwise legal activities off the job, the Hatch Act reform bill would clear up the ambiguity and vagueness . . . ."); *id.* at 6777 (statement of Rep. Parris) (" 'bright line' rule" — "prohibiting all on-the-job political activity while permitting participation in any otherwise legal political activity during the Federal employees' own time" — "would provide clear guidance on permissible activity").

[43] OPM's proposed regulations reflect this absolute, bright-line rule, creating distinctions that might otherwise seem hypertechnical. *See* 59 Fed. Reg. at 48,774 (proposed 5 C.F.R. § 734.306, Example 10) ("An employee may stuff envelopes for a mailing on behalf of a candidate for partisan political office while the employee is sitting in the park during his lunch period if he is not considered to be on duty during his lunch period."); *id.* (proposed 5 C.F.R. § 734.306, Example 11) ("An employee may engage in political activity in the courtyard outside of a Federal building where no official duties are discharged as long as the employee is not on duty.").

[44] *See, e.g.,* S. Rep. No. 103–57, at 14 (1993), *reprinted* in 1993 U.S.C.C.A.N. 1802, 1815; 139 Cong Rec. 15,366–67 (1993) (statement of Sen. Glenn); *id.* at 15,532 (statement of Sen. Glenn); *id.* at 15,741 (statement of Sen. Glenn); *id.* at 15,785 (statement of Sen. Sarbanes); *id.* at 16,039 (statement of Sen. Glenn); *id.* at 16,054 (statement of Sen. DeConcini); *id.* at 3275 (statement of Rep. Upton); *see also, e.g.,* 135 Cong. Rec. 6773 (1989) (statement of Rep. Morella).

Insofar as the broad ban on "political activity" in § 7324 establishes an across-the-board prohibition on certain forms of on-duty *expressive* activity — such as, e.g., wearing buttons or putting up bumper stickers — it may raise difficult constitutional questions. *Compare, e.g., Broadrick v. Oklahoma,* 413 U.S. 601, 618 (1973) (insofar as state law restricts public employees from wearing political buttons or displaying political bumper stickers, such restrictions "may be . . . unconstitutional"); *Hobbs v. Thompson,* 448 F.2d 456, 475 (5th Cir. 1971) (banning firefighters from displaying political bumper stickers is unconstitutional); *American Fed'n of Gov't Employees v. Pierce,* 586 F. Supp. 1559, 1561–63 (D.D.C. 1984) (Veterans Administration policy absolutely prohibiting employees from wearing political buttons on duty is unconstitutional); *McNea v. Garey,* 434 F. Supp. 95, 108–11 (N.D. Ohio 1976) (municipal regulation prohibiting police officers from all discussions or expressions of politics is unconstitutional); *Weaver v. Shaffer,* 170 W. Va. 107, 108–09, 114, 290 S.E.2d 244, 245–46, 251 (W. Va. 1980) (state law prohibiting deputy sheriffs from engaging in "any political activity of any kind" would be unconstitutionally overbroad were it not for court's interpretation of that ban to proscribe only those political activities that the Supreme Court in *Letter Carriers* decided may constitutionally be proscribed), *with, e.g., Wicker v. Goodwin,* 813 F. Supp. 676, 678, 681 (E.D. Ark. 1992) (state law prohibiting state troopers from publicly and openly espousing candidacies is not unconstitutional); *Connealy v. Walsh,* 412 F. Supp. 146, 158 (W.D. Mo. 1976) (juvenile court regulation prohibiting employees from displaying political bumper stickers on vehicles used for court business or parked in court parking lot is not unconstitutional); *State ex rel. Trautman v. City of Farmington,* 799 S.W.2d 638, 642–43 (Mo. App. 1990) (municipal laws and regulations prohibiting police officers from expressing opinions on political subjects and candidates on duty, and from displaying on duty any political pictures, stickers, badges or buttons, are not unconstitutional); *Ferguson Police Officers Ass'n v. City of Ferguson,* 670 S.W.2d 921, 928–29 (Mo. App. 1984) (city provision prohibiting police officers from speaking, literally or through bumper stickers, signs and buttons, in favor or against candidates for city council, is not unconstitutional); *State v. Stuler,* 122 So. 2d 1 (Fla. 1960) (state statute prohibiting state employees from "advising" other employees to make political contributions is not unconstitutional, even as to "advice" that is not coercive in nature). We have no occasion in this Opinion to address these constitutional questions.

[45] *See, e.g.,* 139 Cong. Rec. at 1233 (statement of Sen. Glenn); *id.* at 15,368 (statement of Sen. Glenn); *id.* at 15,785 (statement of Sen. Sarbanes); *see also, e.g.,* 136 Cong. Rec 10,035 (1990) (statement of Sen. Glenn).

illegal to give as well as to ask for'' such contributions while on duty. 139 Cong. Rec. 16,039 (statement of Sen. Glenn). [46]

With this understanding of the meaning of "political activity" in § 7324, we can now examine whether and under what circumstances any of the participants in the proposed salary-allocation practice would violate the restrictions in that statute.

### 1. *Offerors*

The Criminal Division has argued that "the circulation of the proposed payroll withholding offer . . . may constitute [on-duty and on-site] 'political activity.' " Memorandum for Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, from Jo Ann Harris, Assistant Attorney General, Criminal Division at 7 (Oct. 24, 1994) (citing 5 U.S.C. § 7324).

But, just as making available the salary-allocation system for PAC contributions cannot fairly be considered "solicitation," *see supra* pp. 53–58, neither can it fairly be considered "political activity." As long as the heads of agencies making such offers do not request employees to make use of the allocation system, and do not favor one PAC over another (or favor allocation to PACs over nonallocation), then it is hard to see how they would be engaged in "political activity," any more than they would be when they authorize their employees to take an excused absence, with pay, in order to vote in an election. *See, e.g.*, Department of Justice Order No. 1630.1B, ch. 14, § 91(b) (July 22, 1991) (heads of components may, under certain circumstances, authorize excused absence for employees who wish to vote or register to vote in any election). Under OPM's proposed regulation — which we think is an accurate interpretation of § 7324 — activity becomes "political," and thus proscribed on duty and in federal buildings, only when it is "directed toward the success or failure of a political party, candidate for partisan political office, or partisan political group." *See supra* p. 72. The neutral offer of access to the salary-allocation system proposed by OPM would not be proscribed under this standard; while such action may facilitate political activity, it is not political activity itself.

### 2. *Administering Employees*

The Criminal Division further has suggested that federal employees implementing other employees' salary allocations to PACs may violate the HARA prohibition against "political activity" on duty or in federal facilities. Memorandum for Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, from Jo Ann Harris, Assistant Attorney General, Criminal Division at 7 (Oct. 24, 1994).

---

[46] *Accord* 136 Cong. Rec. 9777 (1990) (statement of Sen. Glenn with respect to materially identical legislation) ("No political activity, *no political contributions*, no nothing by Federal employees while they are on the job.") (emphasis added).

We conclude, however, that the employees who would perform the acts of ministerial facilitation of PAC contributions would not thereby engage in "political activity." The actions of those employees would not be undertaken with any *intent* to benefit the PACs; the employees in question would merely be providing a service that they are required by duty to provide, in response to requests by other employees over which the facilitating employees have no control. (Indeed, insofar as the authorization forms merely request salary assignments to particular bank accounts, the employees administering those assignments may well be unaware that they are dealing with PAC contributions — that is to say, the administering employees' involvement in political activity could be entirely unwitting.)

Again, under OPM's proposed regulation, an activity is "political activity" — and therefore cannot be performed on duty — if that activity is "directed toward the success or failure of a political party, candidate for partisan political office, or partisan political group." We think the "political activity" ban in the statute, and the "directed toward the success or failure" language of the proposed regulation, fairly read, contain an implicit intent requirement: an employee's activity is not "political activity" unless that employee intends that the activity be directed toward the success or failure of a political party, candidate, or group. If an employee merely acts at the behest, or "direction," of another employee, and has no independent intent to assist in the "success or failure" of the political party, candidate, or group, then that employee would not herself be engaged in "political activity." [47] The employees in question here would facilitate the PAC contributions not because they intended to assist the PAC, but because their duty required them to do so: they would have no discretion in the matter. Were it the case that employees could violate § 7324(a) by virtue of any ministerial and/or unwitting assistance in political activity, regardless of an intent to advance any political end, then any postal employee delivering a mailed political contribution would violate § 7324(a). That could not have been Congress's intent.

### 3. Contributors

The most troublesome aspect of the proposed use of the salary-allocation system for PAC contributions arises with respect to the federal employees who would actually be making the contributions through the use of that system. [48]

We first must address a threshold question: whether an employee engages in "political activity" under § 7324 when the employee takes steps to have a portion of his or her salary transmitted to a PAC. Federal employees are, as a general matter, permitted under the HARA to make contributions to partisan political candidates and to partisan political organizations such as PACs. *See, e.g.,* 59 Fed.

---

[47] This assumes, of course, that the facilitating employee, as part of her job duties, simply administers all salary allocations equally and without favor, and does not have an independent intent to "direct," or effect, the political contribution.

[48] There is nothing in OPM's regulations that speaks directly to the questions raised in this section. Nonetheless, we note that none of our conclusions in this section is in any way inconsistent with those proposed regulations.

Reg. at 48,772 (proposed 5 C.F.R. §734.208(a)). However, it also is clear under the HARA that making such a political contribution is "political activity," *see* 18 U.S.C. §610, and therefore is subject to the restrictions of §7324. Furthermore, in light of Congress's obvious intent that "political activity" be read as broadly as possible, *see supra* pp. 72–74, it is plain that a federal employee also engages in "political activity" by taking action sufficient to effect the making of a political contribution, such as by taking steps to ensure that a portion of his or her salary is contributed to a political campaign or to a PAC.

OPM does not dispute that making contributions to partisan political campaigns or candidates is "political activity."[49] OPM contends, however, that under the Second Circuit's holding in *Biller*, making contributions *to PACs* is not a "political activity," because such contributions are not necessarily *partisan* in nature. *See* Letter for Dawn E. Johnsen, Deputy Assistant Attorney General, Office of Legal Counsel, from Lorraine Lewis, General Counsel, Office of Personnel Management at 9 (Nov. 4, 1994); Letter for Dawn E. Johnsen, Deputy Assistant [Attorney General], Office of Legal Counsel, from Lorraine Lewis, General Counsel, Office of Personnel Management at 3–4 (Dec. 13, 1994).

In *Biller*, two union presidents had urged their members — fellow federal employees — to contribute funds to the unions' PACs. The Second Circuit ruled that the fundraising pleas of the union presidents were not solicitations in concert with a partisan political campaign or organization. 863 F.2d at 1090. The court reasoned as follows:

> [A]s the ALJ found, the funds [contributed to union PACs] were "not designated for any political campaign, party, committee or candidate *at the time they were made.*" . . . [T]here is no proof in the record that suggests either that petitioners were acting in concert with a partisan political campaign *or that the funds were actually distributed or spent for that purpose.* On that subject, the record is silent.

*Id.* (emphasis added). The court did not address whether its decision would have been different if the record *had* indicated that the union PACs "actually distributed or spent" their collected funds for a partisan political campaign.

Even if we assume that PAC contributions could not be considered "partisan" activities under *Biller*'s interpretation of the old Hatch Act,[50] OPM's reliance on this aspect of *Biller* is unpersuasive *under the HARA*, for the following reasons.

---

[49] This is confirmed in OPM's proposed regulations. Making political contributions to a political candidate would be "political activity" because it is "an activity directed toward the success or failure of a political party, candidate for partisan political office, or partisan political group." 59 Fed. Reg. at 48,770–71 (proposed 5 C.F.R. §734.101).

[50] The Second Circuit suggested that this might not be the case if and when the contributed PAC funds "were actually distributed or spent" by the PACs on partisan political campaigns. 863 F.2d at 1090. The subsequent confusion engendered on this question is exemplified by the positions articulated by the Special Counsel. In 1992, the Special Counsel commented that, under her reading of *Biller*, encouraging contributions to PACs did not implicate

Although there are indications in the congressional floor debates that some members of Congress may have intended the HARA to prohibit only *partisan* political activity on duty and in a federal building,[51] the language of § 7324 does not refer to "*partisan* political activity" — an omission that seems fairly conspicuous in light of the Hatch Act's prior focus on partisan activity. For purposes of this Opinion, we need not decide whether § 7324 of the HARA does (or constitutionally may) prohibit any or all political activity relating to *non*partisan issues and elections. It is sufficient for present purposes simply to note that, regardless of how that question would be answered, and whether or not PACs can in some sense be considered "nonpartisan," one thing is clear: Congress intended that making contributions to PACs *is* to be considered "political activity" under the terms of the HARA.

This conclusion is compelled by the language of the statute itself. Congress indicated in section 4 of the HARA, 107 Stat. at 1005 (creating 18 U.S.C. § 610) that "making . . . any political contribution" is "political activity." "Political contribution," in turn, is defined to include "any gift . . . or deposit of money or anything of value, made for *any* political purpose." 5 U.S.C. § 7322(3)(A). Indeed, Congress specifically identified contributions to multicandidate political committees as "political contributions" in § 7323(a)(2) of the statute.[52] Because a multicandidate political committee is a type of PAC,[53] it follows that making a contribution to a PAC is "political activity," at least as that term is understood in the HARA.[54] This conclusion is bolstered by the fact that the leading Senate

---

the Hatch Act if those contributions "were not earmarked for distribution to partisan groups or candidates when the request was made." Transcript of *Tenth Annual Judicial Conference of the United States Court of Appeals for the Federal Circuit.* 146 F.R.D. 205, 276 (1992) (comments of Special Counsel Kathleen Koch). However, that same year, the Special Counsel informed covered employees that "active participation" or "active involvement" in a PAC was prohibited with respect to those PACs that "function to ensure the success or failure of certain partisan political candidates." Office of Special Counsel, *Hatch Act Facts . . . About PACs* 2–3, 4 (1992).

[51] *See, e.g.,* 139 Cong. Rec. at 3278 (statement of Rep Ford) ("employees would continue to be prohibited from engaging in partisan political activity while on duty"); *id.* at 3281 (statement of Rep. Gephardt) (taxpayer money may not be used for "partisan political purposes"); *id.* at 15,370 (statement of Sen. Roth) (bill would prohibit "partisan political activity" on duty). *id.* at 16,038–39 (statement of Sen. Glenn) (the prohibition "means that no partisan political activity can occur during working hours"); *id* at 21,818 (statement of Rep. Ford) ("employees would continue to be prohibited from engaging in partisan political activity while on duty").

[52] In § 7323(a), Congress banned solicitation of all "political contributions" except those made under certain circumstances to particular multicandidate political committees. Congress must have considered contributions to such committees to be "political contributions," because otherwise there would have been no need to carve out the exception.

[53] Section 7323(a)(2)(C) refers to "multicandidate political committees," as that term is defined under section 315(a)(4) of the Federal Election Campaign Act of 1971. 2 U.S.C. § 441a(a)(4). Such a committee, by definition, "has made contributions to 5 or more candidates for Federal office." 2 U.S.C. § 441a(a)(4). This is a PAC under the definition we are using in this Opinion, *see supra* note 4.

[54] Under the definition of PAC that we are using in this opinion, *see supra* note 4, PACs that are not multicandidate political committees also make contributions or expenditures to influence campaigns for partisan political office; therefore, there is nothing about such PACs to distinguish them from multicandidate political committees for purposes of the present discussion. A federal employee contributing to any PAC would know that her contribution would be used — at least in part — to support one or more partisan candidates for political office. *See FEC v. California Med. Ass'n,* 502 F. Supp. 196, 201–03 (N.D. Cal. 1980) (holding that it is necessary to presume, as a matter of law, that at least a portion of every contribution to a PAC that makes contributions in federal elections will be used by the PAC for contributions to such elections, even if the PAC uses a majority of its funds for other purposes);

Continued

sponsor of the HARA, Senator Glenn, referred specifically to PAC contributions in explaining what activity would be prohibited on duty. *See* 139 Cong. Rec. 16,038 (1993).

Thus, a federal employee does engage in political activity by taking steps — such as transmitting direct-deposit forms to the appropriate payroll officials — sufficient to ensure that a portion of his or her salary is transferred to a PAC. In the following sections, we discuss whether and when such activity would violate § 7324.

a. *Employees Covered Under § 7324(b)*

In § 7324(b), Congress addressed the political activity of certain employees who are not covered under § 7324(a), to whom we will refer as "7324(b) employees." The employees in question are those "the duties and responsibilities of whose positions continue outside normal duty hours and while away from the normal duty post," *and* who are either (i) "employee[s] paid from an appropriation for the Executive Office of the President"; or (ii) "employee[s] appointed by the President, by and with the advice and consent of the Senate, whose position[s] [are] located within the United States, who determine[ ] policies to be pursued by the United States in relations with foreign powers or in the nationwide administration of Federal laws." 5 U.S.C. § 7324(b)(2). [55] Such employees "may engage in political activity otherwise prohibited by subsection (a)," 5 U.S.C. § 7324(b)(1), such as political activity on duty. This special treatment was necessary because these employees are, for purposes of the HARA, "considered to be continuously on duty," and "[w]ithout this exception, the language of [§ 7324(a)] could be read to preclude political activity at any time by these individuals." H.R. Rep. No. 103–16, at 22 (1993). Because the "on-duty" prohibitions were therefore unworkable for the § 7324(b) employees, Congress allowed those employees to engage in political activity, but only "*if the costs associated with that political activity are not paid for by money derived from the Treasury of the United States.*" 5 U.S.C. § 7324(b)(1). Therefore, the § 7324(b) employees cannot use the federal salary-allotment system to make political contributions, such as contributions to PACs, because the costs incurred in making such contributions —

---

*see also California Med. Ass'n v. FEC*, 453 U.S. 182, 199 n.19 (1981) (plurality opinion) (even if person contributing to PAC attempts to "earmark[ ]" such contribution for nonpolitical purposes (e.g., "administrative support"), it must be assumed as a matter of law that the funds will be used for the PAC's contributions to political campaigns). Insofar as federal employees might wish to make contributions to political committees that have not made, and do not make, contributions or expenditures to influence campaigns for partisan political office — that is, to committees other than those we have defined as "PACs" — such employee contributions would be beyond the scope of this Opinion. *See supra* note 4.

[55] It may be unclear whether certain employees are covered under the two-part test of § 7324(b). And, as OPM itself has noted, "in view of the different circumstances of each employee who might claim coverage," it would be "impractical to seek to identify all positions which qualify" for § 7324(b) status. 59 Fed. Reg. at 48,769. If it is unclear whether a particular employee falls within the aegis of § 7324(b), a request can be made to the Office of Special Counsel for an advisory opinion on that question. *See* 5 C.F.R. § 1800 3.

specifically, the costs of processing and transmitting the money to the PACs — would be "paid for by money derived from the Treasury of the United States." [56]

b. *All Other Federal Employees Covered by the HARA*

All other federal employees covered by the HARA [57] may not engage in "political activity": (i) while on duty; (ii) while in "any room or building occupied in the discharge of official duties by an individual employed or holding office in the Government of the United States or any agency or instrumentality thereof"; (iii) while wearing a uniform or official insignia identifying the employee's office or position; or (iv) while using any vehicle owned or leased by the federal government. 5 U.S.C. § 7324(a)(1)–(4).

It follows that such an employee may not make contributions to PACs while in a federal building or while on duty. Furthermore, if such an employee wishes to take steps to effect a transfer of a portion of her salary to a PAC — such as transmitting to the appropriate authorities the forms authorizing such salary transfers — she must do so only when off-duty and outside a federal facility. Under the proposed practice, then, covered employees would violate § 7324(a) if they were to fill out and transmit the necessary direct-deposit forms while on duty or in a federal building.

OPM contends that "[t]o allow employees to mail allotment authorizations but not hand them directly to payroll personnel would result in an illogical and unenforceable arrangement." Letter for Dawn E. Johnsen, Deputy Assistant [Attorney General], Office of Legal Counsel, from Lorraine Lewis, General Counsel, Office of Personnel Management at 4 (Dec. 13, 1994). Indeed, requiring employees to be off duty when they transmit authorization forms to payroll personnel may seem like a legalistic technicality. Nonetheless, this result comports with Congress's objective to create a bright-line rule — that the § 7324(a) prohibitions be "absolute[ ] and unequivocal[ ]" — so that there could be no ambiguity or vagueness about what is and is not permitted on duty. *See supra* pp. 72–74 & nn. 42–46. Accordingly, the prohibition we have identified here is similar to some of the examples OPM has identified in its proposed regulations — for

---

[56] Under the Federal Leave Act, *see* 5 U.S.C. §§ 6301(2)(x) and (xi), certain employees are not subject to the annual-leave and sick-leave provisions of chapter 63 of title 5, in part because such employees are, for leave purposes, considered to have duties that continue beyond normal duty hours. *See also* 5 C.F.R. §§ 630.211(b)(1)–(3). As the House Report on HARA noted, such employees may, *for Leave Act purposes,* be "presumed to be on duty at all times." *See* H.R. Rep. No. 103–16, at 23 (1993). However, some of these employees will not satisfy one of the other requirements to fall within HARA § 7324(b) — for example, their appointment may not be subject to the advice and consent of the Senate. It is important to note that these leave-exempted employees who are not covered by § 7324(b) should not be considered "continuously on duty" for purposes of HARA § 7324, even where their exclusion from the Leave Act is "based on the presumption that the position requires the employee to be on duty at all times." *Id.* If such employees were considered "continuously on duty" for purposes of § 7324, they would never be permitted to engage in any political activity — including voting, making contributions, etc. But Congress intended that § 7324 would not "preclude political activity" for employees "at any time." *Id.* at 22. Therefore, for purposes of HARA § 7324 (albeit not necessarily for purposes of the Leave Act), such employees should be considered to be on duty only during their "regular," or "ordinary," duty hours, and remain "free to engage in political activity . . . [o]n their own time." *Id.* at 23.

[57] *See supra* note 8.

example, that an employee may not stuff envelopes with political literature while in a federal building, but may do so while sitting in a park during his lunch period *if* he is not considered to be on duty during that lunch period. *See* 59 Fed. Reg. at 48,774 (proposed 5 C.F.R. § 734.306, Example 10); *see also supra* note 43. Given that Congress has precluded all political activity from occurring (for example) in federal buildings, it is not illogical to require employees who engage in such activity to do so outside of those buildings.

The question then becomes whether contributing employees would violate § 7324(a) even if they are off duty and outside a federal building when they fill out the relevant forms and transmit those forms to the appropriate administrative officials. Such a practice might at first glance appear objectionable, because an employee acting in such a manner would cause other federal employees — i.e., the "administering employees" — to do, on her behalf, precisely what the contributing employee may not herself do: send a contribution to a PAC while on duty and from a federal building.[58] Although, for reasons explained below, this is a close question, we conclude that an employee acting in this manner would not violate § 7324(a), because none of that employee's "political activities," or activities "directed toward the success" of the PAC, would violate the plain terms of the four prohibitions in that subsection. In particular, such an employee would not be on duty or in a federal building when she engaged in political activity.

Of course, the federal government subsidizes the transmission costs associated with transferring funds from employees' salaries to PACs. And there is some evidence that one of Congress's goals in enacting § 7324 was to prevent federal employees from using taxpayers' funds to engage in political activity.[59] For example, the House Majority Leader stated: "Any on-the-job political activities are prohibited. It prohibits any use of taxpayer money for partisan political purposes." 139 Cong. Rec. 3281 (1993) (statement of Rep. Gephardt).[60] Moreover,

---

[58] We explained above that, in such a case, the administering employees would not themselves violate the on-duty prohibition, because they are not the persons "directing" the activity toward the success or failure of the PAC to which the contribution is made, and may even be entirely unaware that their activity in any way involves political allocations. *See supra* p. 75. By contrast, however, the contributing employee would be engaged in "directing" the on-duty, on-premises activity toward the success of the PAC.

[59] In 1984, OPM itself apparently was of the view that, under the pre-HARA Act, similar considerations warranted a restriction prohibiting the practice at issue here: "[T]he use of a Federal payroll deduction scheme or the Government's allotment system as a conduit for political contributions by Federal employees subject to the Hatch Act would involve the use of Federal workplaces and instrumentalities to pay, collect, and receive such contributions." 47 Fed. Reg. at 57,724.

[60] Several House members in an earlier Congress expressed the same understanding with respect to a materially identical "on-duty" prohibition in H.R. 3400, 100th Cong. (1987) (proposing new 5 U.S.C. § 7324(a)(1)–(4)(B)). *See, e.g.,* 133 Cong. Rec. 32,087 (1987) (statement of Rep. Horton) ("It . . . prohibits use of taxpayer money for political purposes"); *id.* at 32,088 (statement of Rep. Ridge) ("[P]olitical work . . . cannot be allowed on the taxpayer's time. It cannot be done on Federal Government time, with Federal information or equipment."); *id.* at 32,104 (statement of Rep. Rahall) (bill prohibits "use of taxpayer money for political activities"); *id.* at 32,105 (statement of Rep. Biaggi) (same); *see also* 135 Cong. Rec. 6776 (1989) (statement of Rep. Gephardt) (bill would "prohibit government facilities from being used for partisan political purposes").

This is not to say that legislators provided no other reasons for the "on-duty" prohibition. For example, there are snippets of the legislative history of the HARA in 1993 suggesting that Congress also expected the "on-duty" prohibition to: (i) foreclose the possibility of coercion of subordinate employees by supervisory employees, *see, e.g.,* 139 Cong. Rec. 15,367–68 (statement of Sen. Glenn); *id.* at 15,531–32 (statement of Sen. Glenn); *id.* at 15,741

as we have explained, § 7324(b) expressly forbids the employees identified in that section from using federal funds for political activity. It might seem anomalous to forbid the § 7324(b) employees from using the salary-allocation system, but to permit all other federal employees to use that system — and the federal funds associated with it — for political activity, just because the latter are not, under the HARA, considered to be continuously on duty. In that case, the "continuously on duty" employees, *see supra* pp. 78–79, would in a significant respect be more restricted in the exercise of their political activity than all other federal employees.

Nevertheless, in stark contrast to § 7324(b), § 7324(a) does not include an express prohibition on the use of federal funds for political activity. In the four subsections of § 7324(a), Congress saw fit to ban political activity by a federal employee while (i) on duty; (ii) in a federal building; (iii) in uniform; or (iv) using a federal vehicle. Conspicuously absent from this list is any prohibition on political activity "using instrumentalities owned by the United States," "using any federal facilities," or "using money derived from the Treasury of the United States." [61]

Indeed, the fact that Congress *did* include such a prohibition in § 7324(b) only strengthens the argument against reading such a prohibition into the previous, companion subsection. A fundamental canon of statutory construction, frequently invoked by the Supreme Court in recent years, is that " 'where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' " *Russello v. United States*, 464 U.S. 16, 23 (1983) (citation omitted). [62] The language of § 7324(b) "shows that Congress knew how to draft" a prohibition on the use of federal funds for political activity "when it wanted to." *City of Chicago v. Environmental Defense Fund*,

---

(statement of Sen. Glenn); *id.* at 16,051–52 (statement of Sen. Glenn); and (ii) to prevent the "specter," or appearance to the public, that the federal government is supporting particular candidates, *see, e.g.*, H.R. Rep. No. 103–16, at 19 (1993).

[61] By contrast, several state "Little Hatch Acts" do include such specific prohibitions. *See, e.g.*, Ala. Code § 17-1-7(c) (1987) (no state employee "shall use any state funds, property or time, for any political activities"); Alaska Stat. § 24.60.030(a)(5) (1992) (legislative employee may not, with certain exceptions, "use or authorize the use of state funds, facilities, equipment, services, or another government asset or resource" for certain political purposes); Conn. Gen. Stat. Ann. § 5–266a(b) (1988) (state employee shall not "utilize state funds, supplies, vehicles, or facilities" for certain political purposes); N.C. Gen. Stat. § 126–13(a)(2) (1993) (state employee may not "utilize State funds, supplies or vehicles" for certain political purposes); Tenn. Code Ann. § 2–19–206(a) (1985) (state employee may not "use any of the facilities of the state, including equipment and vehicles," for certain political activity).

[62] *See also Brown v. Gardner*, 513 U.S. 115, 120 (1994); *FEC v. NRA Political Victory Fund*, 513 U.S. 88, 95 (1994); *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537 (1994); *Custis v. United States*, 511 U.S. 485, 492 (1994); *City of Chicago v. Environmental Defense Fund*, 511 U.S. 328, 338 (1994); *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993); *International Org. of Masters, Mates & Pilots v. Brown*, 498 U.S. 466, 476 n.10 (1991); *Gozlon-Peretz v. United States*, 498 U.S. 395, 404–05 (1991); *General Motors Corp. v. United States*, 496 U.S. 530, 537 (1990); *United States v. Monsanto*, 491 U.S. 600, 610–11 (1989); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431–32 (1987); *Lawrence County v. Lead-Deadwood School Dist. No. 40–1*, 469 U.S. 256, 267 (1985); *United States v. Erika, Inc.*, 456 U.S. 201, 207–08 (1982); *Lehman v. Nakshian*, 453 U.S. 156, 162–63 (1981); *Fedorenko v. United States*, 449 U.S. 490, 512–13 (1981).

511 U.S. 328, 338 (1994); *accord Custis v. United States*, 511 U.S. 485, 492–93 (1994).

The discrepancy between §§ 7324(a) and 7324(b) might be explained by the fact that Congress may have considered such an explicit "no federal funds" prohibition to be superfluous in the former subsection. Congress might not have contemplated any situation in which otherwise lawful political activity could be accomplished using federal funds without violating one of the four subsections of § 7324(a); thus, Congress could well have believed that the prohibitions in that subsection precluded the need for a separate "no federal funds" provision. But "[t]hat expectation, even if universally shared [by members of Congress], is not an adequate substitute for a legislative decision," *Yellow Freight Sys., Inc. v. Donnelly*, 494 U.S. 820, 824–25 (1990), to prohibit the use of federal funds for political activity. *See also Fort Stewart Schools v. FLRA*, 495 U.S. 641, 650 (1990) ("There is no conceivable persuasive effect in legislative history that may reflect nothing more than the speakers' incomplete understanding of the world upon which the statute will operate."). Even if Congress intended a complete ban on federal funds for political activity, "[t]he short answer is that Congress did not write the statute that way." *Russello*, 464 U.S. at 23 (citation omitted). Therefore, the "no federal funds" prohibition of § 7324(b) does not apply to employees who are not identified in that section, and those employees may make contributions to PACs through the use of the salary-allocation system so long as they are off duty and off federal premises when they take the steps sufficient to trigger the use of the system.

## CONCLUSION

None of the federal employees who would engage in the practices in question would, without more, violate the relevant criminal provisions, 18 U.S.C. §§ 602 and 607. What is more, federal employees offering use of or administering the salary-allocation system for PAC contributions would not, without more, violate the civil provisions of the HARA.

However, the federal employees identified in 5 U.S.C. § 7324(b) may not use the salary-allocation system to contribute money to PACs. The heads of agencies may, in their discretion, permit all other federal employees covered by the HARA to make political contributions to PACs through use of the salary-allocation system, but only if such employees are off duty and off federal premises when they take the steps necessary to use that system.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*